IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RUBA OTHMAN, as special administrator ) <br> of the Estate of RAMIZ OTHMAN; SUSAN ) <br> ANDERSON, individually; and as Mother and ) <br> Next Friend of SURA OTHMAN, a minor, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> CITY OF CHICAGO and ) <br> AARON CARRANZA, ) <br> ) <br> Defendants. ) | Case No. 11-cv-5777 <br><br> Judge Robert M. Dow, Jr. |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiffs' motion for new trial [244] and Plaintiffs' motion for post-trial discovery [257]. For the reasons set forth below, Plaintiffs' motions are respectfully denied.[1] No appearances are necessary on 2/18/2016.

As a housekeeping matter, the Court previously struck as premature Plaintiffs' motion [247] to extend time to file an amended notice of appeal, for transcripts to proceed *in forma pauperis*, and for leave to amend Plaintiffs' motion for a new trial (see 10/26/2015 Order [253]), but that motion still appears as an active motion on the Court's docket. The Clerk is instructed to strike Plaintiffs' motion [247] as an active motion.

**I.   Background**

Plaintiffs filed suit against Defendant Officer Aaron Carranza[2] alleging that Officer Carranza acted with excessive force and without legal justification when he shot and killed

---

[1] In accordance with Fed. R. App. P. 4(a)(4)(A)(iv)–(vi), the 30-day time period for Plaintiffs to file an appeal runs from the date of this order.

[2] The City of Chicago was included as a Defendant only for purposes of indemnification; there were no substantive claims against the City.

Ramiz Othman. Plaintiffs proceeded to trial on a federal excessive-force claim under 42 U.S.C. § 1983 and a state law wrongful death/survival claim under Illinois law. On 8/21/2015, a jury returned a verdict in favor of Defendant Carranza on both counts, and a judgment was entered in favor of Defendants. [See 232, 235.]

Now before the Court is Plaintiffs' motion for a new trial [244] pursuant to Fed. R. Civ. P. 59(a) and 60(b), in which Plaintiffs argue that a new trial is warranted because (1) Defendant Aaron Carranza testified falsely regarding whether he shot Ramiz Othman in the back, and (2) Defendants' counsel failed to disclose this "drastic change" in testimony, despite their obligation to do so pursuant to Fed. R. Civ. P. 26(e). Plaintiffs also bring a motion for post-trial discovery [257].

## II. Legal Standard

A motion for a new trial is governed by Federal Rule of Civil Procedure 59(a), which says that "[a] new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). When considering whether the jury's verdict goes against the manifest weight of the evidence, a court analyzes the "general sense of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook Cnty.*, 650 F.3d 631, 633 (7th Cir. 2011) (citations omitted). But "[a] verdict will be set aside as contrary to the manifest weight of the evidence only if 'no rational jury' could have rendered the verdict." *Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008) (quoting *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006)). Moreover, "[j]ury verdicts deserve particular deference in cases with 'simple issues but highly disputed facts.'" *Id.* (quoting *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995)).

A party can also seek relief from judgment under Federal Rule of Civil Procedure 60(b), which—in contrast to Rule 59(a)—is designed to address mistakes attributable to special circumstances, not to address manifest legal or factual errors. *Russell v. Delco Remy Div. of Gen Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995). Under Rule 60(b), a court may relieve a party from a final judgment or order based on, among other reasons, "mistake, inadvertence, surprise, or excusable neglect," Fed. R. Civ. P. 60(b)(1), or "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party," Fed. R. Civ. P. 60(b)(3). "To obtain relief under Rule 60(b)(3), a party must show that she has a meritorious claim that she was prevented from 'fully and fairly presenting' at trial as a result of the adverse party's fraud, misrepresentation, or misconduct." *Willis v. Lepine*, 687 F.3d 826, 833 (7th Cir. 2012). (citation and internal quotation marks omitted). Relief under Rule 60(b) "is an extraordinary remedy and is granted only in exceptional circumstances." *Karraker v. Rent–A–Center, Inc.*, 411 F.3d 831, 837 (7th Cir. 2005).

### III. Analysis

#### A. False Testimony

Plaintiffs' primary argument is that the Court should grant a new trial because Defendant Carranza allegedly gave false testimony at trial. Plaintiffs invoke both Rule 59(a) and Rule 60(b)(3) in their "legal standard" section, but do not tie their arguments to any particular provision. The Seventh Circuit has said that "[i]f a verdict is based on false testimony, the district judge has the discretion under Rule 59 to grant the injured party a new trial." *Antevski v. Volkswagenwerk Aktiengesellschaft*, 4 F.3d 537, 540 (7th Cir. 1993). False testimony also can be considered a form of "fraud" under Rule 60(b)(3), and courts have noted that there is no substantive difference in the standard for assessing a motion for new trial based on introduction

3

of false testimony under Rules 59(a) and 60(b)(3). See *White v. Anthology, Inc.*, 2009 WL 4215096, at *2 (N.D. Ill. Nov. 16, 2009); *Willis*, 687 F.3d at 835–36. As such, to succeed on this argument under either Rule 59(a) or 60(b)(3), Plaintiffs must show that they maintained a meritorious claim at trial and that because of Defendant Carranza's fraud or misrepresentation—in this case, the presentation of false testimony—they were prevented from fully and fairly presenting that claim. See *Venson*, 749 F.3d at 651; *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995). Plaintiffs fail this test for several reasons.

First, Plaintiffs have not established that Defendant Carranza gave false testimony. To recap the relevant facts as presented at trial (which are simple and relatively undisputed), Defendant Carranza testified that on the morning of August 20, 2010, Ramiz Othman broke into his home by kicking in his basement door. Defendant Carranza—who was on disability leave from the Chicago Police Department at the time—stood in his bedroom on the main floor of the home with his service revolver while he called 911 to report the break in. Shortly thereafter, Ramiz Othman ascended the basement steps to the main floor of Defendant Carranza's home, putting the two within feet of each other. Ramiz Othman raised a metal object (a tie iron) over his head and moved towards Defendant Carranza, who proceeded to shoot Ramiz Othman 14 times, firing all of his bullets within a matter of seconds, without pause. Plaintiffs introduced an autopsy report showing the entry and exit points of the 14 bullets, and a medical examiner placed rods through the body of a mannequin showing where the bullets entered and exited Ramiz Othman's body. Several of the bullets—approximately six—entered Ramiz Othman through his back. Defendant Carranza did not dispute any of the medical examiner's findings.

The issue that Plaintiffs now raise concerns *not* whether Defendant Carranza shot Ramiz Othman in the back, but whether Defendant Carranza shot Ramiz Othman in the back while

Ramiz Othman was lying face down on the ground (as opposed to while he was falling face down toward the ground). In his deposition, Defendant Carranza gave the following responses to questions from Plaintiffs' counsel:

> Q. Did you shoot [Ramiz Othman] at any time when he was laying down on the ground facedown?
>
> A. Yes.
>
> Q. Where'd you shoot him in his body when he was lying face down on the ground?
>
> A. In his back.

[See 254-1, at 3.] But at trial, Defendant Carranza testified that the force of the bullets caused Ramiz Othman to stagger backwards and hit a wall, causing him to turn so that his back was facing Defendant Carranza. Defendant Carranza testified that he shot Ramiz Othman in the back as he was spinning and falling to the ground, not while he was lying on the ground. And as explained in more detail below (discussing the manifest weight of the evidence), Defendants introduced several independent sources of evidence (the 911 call, the autopsy report, the testimony of the medical examiner, etc.) that corroborated Defendant Carranza's version of the story. Plaintiffs did not provide—either at trial or in their post-trial motion—any evidence supporting their argument that Defendant Carranza's trial testimony was false, save for their identification of the alleged inconsistency between Defendant Carranza's deposition testimony and his trial testimony.

At most, Plaintiffs have demonstrated that Defendant Carranza's trial testimony was *inconsistent* with his deposition testimony. But in order to warrant a new trial, inconsistencies are not enough; the evidence presented at trial must be *false*, and Plaintiffs must prove the falsity—a form of fraud under Rule 60(b)(3)—by clear and convincing evidence. *Wickens v. Shell Oil Co.*,

620 F.3d 747, 758–59 (7th Cir. 2010); see also *White*, 2009 WL 4215096, at *2–3 (moving party provided a post-trial affidavit establishing that the trial testimony in question was actually false). Merely pointing out an inconsistency in testimony—absent any proof that the trial testimony was actually false—is insufficient to warrant the "extraordinary remedy" of a new trial.

Second, Plaintiffs failed to show that Defendant Carranza's allegedly inconsistent testimony prevented them from fully and fairly presenting their case. To be sure, it is not uncommon for trial witnesses to give testimony that is inconsistent with their deposition testimony. Indeed, the Federal Rules of Evidence contemplate such occurrences, and provide a means by which parties can address testimonial inconsistencies within the trial setting: impeachment. See Fed. R. Evid. 613, 801. And indeed, Plaintiffs' counsel *did* impeach Defendant Carranza on this point during trial on several occasions, asking multiple questions about the alleged inconsistency during cross-examination:[3]

> Q. Did you shoot Ramiz Othman at any time when he was lying down on the ground face down?
>
> A. No.
>
> Q. Do you recall being asked this question at your deposition – page 139. Question: "Did you shoot him at any time when he was lying face down on the ground" -- excuse me -- "laying down on the ground face down?" Answer: "Yes."
>
> A. I do recall that, yes.
>
> Q. Where did you shoot him in the body when he was laying face down on the ground?
>
> A. Are you asking me to recall the deposition or --
>
> Q. No, I am asking the question.

---

[3] Neither party has ordered transcripts of the trial testimony, and thus the Court is relying on unedited versions of the trial transcripts prepared by the Court reporter for purposes of this order. As such, the precise wording in these excerpts is subject to change and may appear differently in any final versions of these transcripts.

A. I never shot him when he was lying down or laying down.

Q. Do you recall at your deposition, again on page 139, being asked:
[Question:] "Where did you shoot him in the body when he was laying face down on the ground?"
Answer: "In his back."

A. I do recall, yes.

Q. So that was your testimony at your deposition on December 18, 2012?

A. I misinterpreted your question, but yes, that is the answer that I gave.

MR. BRUGGEMAN: Ask that that be stricken, Judge. That's totally unresponsive to my question.

THE COURT: I will strike the last statement that the witness made and if his counsel wants to follow up on that, they're welcome to do so.

\* \* \*

Q. When he was lying on the ground -- I think actually laying on the ground, bullet holes in him and you're shooting him in the back. He is laying on the ground with his head away from you and his feet towards you; is that correct?

A. I didn't shoot him when he was laying down, so, no.

Q. Do you recall this question being asked of you, and this being your answer -- page 141, line 16 through line 23 on December 18th, 2012 at my office in Mokena. "When he was laying on the ground, bullet holes in him and you are shooting him in the back, he is laying on the ground with his head away from you and his feet towards you --" then there is an objection. Then they tell you go ahead and you answer: "Correct."

A. I misinterpreted your question, sir.

Q. Was that question asked of you and was "Correct," your answer. Yes or no?

A. Yes.

BY MS. BOUDREAUX:

> Q. We are going to get into this a lot more later. But I just want to clear something up immediately. Was there ever a time when Ramiz Othman was laying face down on the ground not moving and you were standing over him shooting him in the back?
>
> A. No.
>
> Q. What was Ramiz Othman's body doing the final moments you were taking the shots?
>
> A. He was falling to the ground but he was still actively clutching a tire iron in his hand.

Plaintiffs' counsel repeated his impeachment later in his examination of Defendant Carranza, culminating in Plaintiffs' counsel reading approximately four pages of Defendant Carranza's deposition transcript, including the excerpt at issue, and then asking the following series of questions:

> Q. What about that four pages of transcript of your deposition on August -- excuse me December 18, 2012, that I just read, confused you about those questions I asked you?
>
> A. In the question regarding shooting "face down," "laying," I heard "shooting," I heard "face down." I was reliving this experience in my head as I'm answering your questions in the deposition, and I'm picturing him falling to the ground. You said, "laying." You said, "lying." I never said that. I answered, "Yes," because I thought I understood the question right. But in prepping for this trial I realized that I did not understand. I [did] not interpret that question how I thought -- how it actually was asked.
>
> Q. So you misunderstood the word lying or laying?
>
> A. I didn't misunderstand it. I heard "shooting" and I heard "face down."
>
> Q. So you were confused?
>
> A. Not at the time. I thought I did understand the question. That's why I answered "yes" and "correct."
>
> Q. Repeatedly?
>
> A. Correct.

> Q. To the same question about, "You shot him when he was lying on the ground?"
>
> A. Like I said, you were asking me questions. I was reliving this incident in my head, and I was answering the questions at the time what I thought was honestly. * * * And they were honest. I heard shooting and I heard face down.
>
> Q. And in court yesterday was the first time you ever told me, the plaintiffs, the plaintiffs' attorneys in this case while this case has been pending that you didn't shoot him in the back when he was laying face down on the ground?
>
> MS. BOUDREAX: I'm going to object to that. He has no duty to do that.
>
> THE COURT: I will sustain the objection.

Plaintiffs' counsel then re-raised this impeachment at length in his closing argument, including in this excerpt:

> MR. BRUGGEMAN: I cross examined or re-examined or questioned Mr. Carranza extensively about his deposition. * * * But the import part is, you know, his testimony here -- and he testified five years to the day after he shot him. And his testimony on December 18, 2012, less than a year and a half after he shot him are different, substantially different I suggest to you. Substantially different.
>
> [Reading from Mr. Carranza's deposition.] "So did you shoot him at any time when he was lying down on the ground face down?"
>
> "Yes."
>
> He doesn't say I don't understand the question. I don't know how that question could be confusing. "Lying face down." The only -- I tried to ask him repeatedly did the word ground confuse you? Did you think I meant the ground outside? Did you think I mean the tile floor in your hallway?
>
> He says, "No. I understood you meant the tile floor."
>
> "So did you shoot him at any time when he was lying down on the ground -- face down?"
>
> "Yes."
>
> And then I asked him, "Where did you shoot him in his body when he was lying face down on the ground?"

9

> And his answer: "In the back."
>
> Does it sound like he didn't understand that question?
>
> * * *
>
> But he has six [shots] to the back when he's laying on the ground. Shoots him six times when he's laying on the ground, face down, head away from him, feet towards him. And the only time he ever said differently is in trial here in front of you.
>
> I ask you to make a verdict for plaintiff.

In other words, the jury was made aware of the allegedly inconsistent testimony on multiple occasions, and was thus given the opportunity to consider Plaintiffs' argument during its deliberations. Plaintiffs' gripe, then, is not about their inability to present their claim; it's more about their dissatisfaction with the impact of their impeachment. In short, Plaintiffs have failed to provide any explanation as to why Defendant Carranza's allegedly inconsistent testimony prevented them from fully and fairly presenting their case to the jury.

Third, Plaintiffs' argument also fails under the traditional Rule 59(a) analysis because the manifest weight of the evidence supported the jury's verdict. See *Venson*, 749 F.3d at 651 ("A new trial is appropriate [pursuant to Rule 59(a)] if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party."). Plaintiffs' theory for their excessive force claim hinged on their argument that Defendant Carranza allegedly shot Ramiz Othman in the back multiple times while he was lying face down on the ground. In other words, Defendants argued that even if the first few shots were justified, at some point the shooting became excessive (namely, when Ramiz Othman was lying defenseless on the ground). Plaintiffs relied primarily (if not exclusively) on the above-mentioned excerpt from Defendant Carranza's deposition to support this argument.

By contrast, Defendant Carranza recounted the incident in great detail at trial, explaining that that the force of the initial shots caused Ramiz Othman to spin, and that Defendant Carranza shot Ramiz Othman in the back as he was spinning and falling to the ground. Defendants corroborated this story by introducing credible evidence (the 911 call, the autopsy report, the testimony of the medical examiner, etc.) establishing that the shooting lasted only 3–4 seconds, and that all 14 shots were discharged rapidly in succession and without pause while Defendant Carranza stood in a stationary position, just feet away from the intruder. The medical examiner also testified about how the bullet wounds to Ramiz Othman's back entered at different trajectories, which was consistent with Defendant Carranza's testimony that Ramiz Othman's body was in motion during the shooting while Defendant Carranza stood in a stationary position. Defendants demonstrated the layout of Defendant Carranza's home, and showed how and where Ramiz Othman entered the basement, how and where he encountered Defendant Carranza, and how and where the shooting took place, including how and where Ramiz Othman's body moved throughout the shooting. Defendants also introduced evidence showing the impact points where the bullets struck parts of Defendant Carranza's home, including holes in walls throughout the house. There was no evidence of any bullet marks on the tile floor below Ramiz Othman's body, as might be expected had Defendant Carranza stood over him, shooting him in the back as he was lying on the ground. In short, Defendants presented evidence from multiple, independent sources corroborating Defendant Carranza's trial testimony about the shooting.

Defendant Carranza also presented evidence to the jury suggesting that he considered Ramiz Othman to be a continuing threat throughout the 3–4 second shooting interval. For example, Defendant Carranza testified that Ramiz Othman had the tire iron clutched in his hand the entire time, even after the shooting stopped, such that a jury could reasonably infer that

Defendant Carranza still felt as though he was in danger, at least during the brief shooting interval. Defendant Carranza also explained that he only stopped shooting when his firearm went into slide lock (*i.e.*, after he had discharged all the bullets), and it wasn't until then—after the 3–4 seconds of shooting—that he was able to assess the situation. After the shooting was over and Defendant Carranza picked up his phone and continued his conversation with the 911 operator, he indicated that Ramiz Othman was still alive (he died approximately 33 minutes later), and the first words that Defendant Carranza said after the shooting were "make it a 10-1," which he explained is a police code indicating that an officer is in need of emergency assistance from all available officers.

Finally, Defendant Carranza presented detailed evidence as to the series of events that led to his unexpected encounter with the unknown man who broke into his home and came at him suddenly with a deadly weapon. Defendant Carranza delivered an emotionally charged telling of the story to the jury, testifying that he had never before fired his service weapon in the line of duty and recreating the fear and anxiety that overcame him in the moments preceding the incident. Plaintiffs, on the other hand, made no attempt to explain or justify why Ramiz Othman broke into Defendant Carranza's home and did little to temper Defendant Carranza's version of the events, banking instead on their argument that Defendant Carranza should have exercised restraint in the number of shots that he fired that day, regardless of the events leading up to the shooting. Plaintiffs' myopic view of the incident, both at trial and in their post-trial motions, ignores Defendants' cogent and holistic telling of the story and ultimately the substantial amount of evidence supporting the jury's finding that Defendant Carranza's use of force was not excessive.

When viewed as a whole, the manifest weight of the evidence presented at trial favored Defendant Carranza's version of the story. The brevity of the incident (*i.e.*, 3–4 seconds from first encounter to final shot), coupled with the trajectory of the impact wounds and the credible evidence of an ongoing threat do not support Plaintiffs' theory that Defendant Carranza repeatedly shot a defenseless man in the back, nor do they support Plaintiffs' argument that Defendant Carranza used excessive force. Accordingly, a new trial is not warranted.

### B. Attorney Misconduct

Plaintiffs also argue that a new trial is warranted because Defendants' attorneys knew that Defendant Carranza was going to change his testimony at trial, but failed to disclose that fact as required by the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 26(e) (explaining the duty to supplement discovery). Plaintiffs claim that Defendants knew of this impending change in testimony as early as July 15, 2015 (approximately one month before trial), the date that Defendants' withdrew their expert as a potential trial witness [see 211, at 1 n.1]. Plaintiffs refer to Defendants' failure to disclose Defendant Carranza's "drastic change" in testimony as an "unfair surprise" amounting to "attorney misconduct." Based on these allegations, it appears as though Plaintiffs are invoking either Rule 60(b)(1) (surprise) or Rule 60(b)(3) (fraud) as their ground for a new trial. Attorney misconduct can also be a ground for a new trial under Rule 59(a) if "the misconduct prejudiced the adverse party," and the standard for assessing such arguments is substantially similar to the "fully and fairly" inquiry used to analyze claims brought pursuant to Rule 60(b)(3). *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012). For completeness, the Court reviews Plaintiffs' argument under Rule 59(a), Rule 60(b)(1), and Rule 60(b)(3). However, Plaintiffs' argument is not persuasive under any standard.

First, as explained above, the Court is not persuaded that Defendant Carranza actually changed his testimony at trial. The allegedly impeaching excerpt from Defendant Carranza's deposition is brief (composed of two compound, leading questions from Plaintiffs' counsel followed by terse answers from Defendant Carranza), and when confronted with this testimony at trial, Defendant Carranza qualified his responses by placing them in context of a more complete version of the story that was corroborated by other independent evidentiary sources. At most, Defendant Carranza offered inconsistent testimony that was appropriately addressed through cross-examination and impeachment. Thus, the Court disagrees with Plaintiffs that there was a "change" in testimony that would require correcting or amending under Rule 26(e).

Moreover, Plaintiffs fail to explain how Defendant Carranza's "drastic change" in testimony amounts to a violation of Rule 26. See Fed. R. Civ. P. 26(e) (outlining the ongoing duty of parties to supplement and correct any incomplete or inaccurate Rule 26(a) disclosures, interrogatory responses, request for production responses, request for admission responses, and expert reports and testimony). The only "change" that Plaintiffs mention is the inconsistency between Defendant Carranza's deposition testimony and his trial testimony, and the duty to supplement/correct imposed by Rule 26(e) does not apply to non-expert deposition testimony. See, *e.g.*, *Ransdell v. Berrie*, 1996 WL 242961, at *5 (N.D. Ill. May 8, 1996); *Black & Decker Corp. v. Positec USA Inc.*, 2015 WL 1543262, at *12 (N.D. Ill. Mar. 31, 2015); Fed R. Civ. P. 26(e), Advisory Committee's Note (1993) ("The revision also clarifies that the obligation to supplement responses to formal discovery requests applies to interrogatories, requests for production, and requests for admissions, but not ordinarily to deposition testimony."). Thus, even if Defendant Carranza had changed his testimony, his attorneys had no obligation to disclose that change under Rule 26(e). In short, Plaintiffs fail to identify any inadequately-updated discovery

responses, or any other rule-based violations, that might give rise to a viable "attorney misconduct" allegation.

The Court also disagrees with Plaintiffs' characterization of Defendant Carranza's allegedly-inconsistent trial testimony as an "unfair surprise" per Rule 60(b)(1). In short, testimonial inconsistencies such as these are not uncommon in the federal courts, and the proper way to address them is through impeachment, cross-examination, and closing argument. They surely are not the type of surprises that warrant the "extraordinary remedy" of a new trial under Rule 60(b)(1).

Plaintiffs also claim that they were unfairly surprised by the fact that potential witness Thomas Behan (who was on both parties' "may call" witness lists [see 207]) became unavailable prior to trial (he refused to appear voluntarily and lived beyond the Court's subpoena jurisdiction), and by Defendant's voluntary withdrawal of their expert witness prior to trial [see 211, at 1 n.1]. [255, at 3.] As to the former, if Plaintiffs wished to call Thomas Behan as a witness, it was incumbent upon them to investigate his availability and their options for securing his attendance at trial. It was not Defendants' obligation to secure a non-party witness's attendance at trial for Plaintiffs' case-in-chief. And as to both witnesses, Defendants were not required to call every person on their pretrial list. See Fed. R. Civ. P. 26(a)(3)(A) (a party must provide to other parties the names of each witness the party expects to present and those it may call if the need arises); see also *United States v. Bond*, 552 F.3d 1092, 1097 (9th Cir. 2009) ("[I]t is elementary that litigants are not *required* to call every witness identified on their witness lists. The witness list simply provides notice to the court and to opposing counsel of the witnesses who *may* be presented at trial."). More importantly, Plaintiffs had the burden of proof in this case, and any argument that they were unable to fully and fairly present their case to the jury because

15

*Defendants* elected not to call certain of *their* witnesses is not persuasive—Plaintiffs' ability to prove that Defendant Carranza used excessive force should not hinge on whether Defendants elect to call a particular witness in their case-in-chief. While Defendants' presentation of witnesses may have been "surprising" to Plaintiffs, Defendants' discretionary decisions are not grounds for a new trial, and Defendants had no obligation to notify Plaintiffs about these details of their trial strategy.

Moreover, in response to Defendants' withdrawal of their expert, Plaintiffs represented to the Court that they had "spent a significant amount of time preparing for the testimony of [Defendants' expert]" and "request[ed] an extension of time to file a supplemental Motion in Limine, depending on Defendants' reasoning for withdrawing their expert." [See 213, at 1–2.] In response, the Court *granted* Plaintiffs' request, allowing Plaintiffs additional time to file any motions in limine on any "issues as to which they believe[d] a pre-trial ruling would be useful." [219, at 5.] Although Plaintiffs did file several motions after the Court's ruling (*e.g.*, motion to bifurcate [221], motion to bar testimony of certain witnesses [222]), Plaintiffs never requested a continuance or any other accommodation based on the allegedly "unfair surprise" presented by Defendants' voluntary withdrawal of their expert. Plaintiffs cannot now claim that they were unfairly prejudiced by Defendants' discretionary act when the Court granted Plaintiffs the only relief that they requested relating to this event.

Also, per Rule 60(b)(3), even if Defendants violate Rule 26 (or any other rule) by not disclosing the alleged change in Defendant Carranza's testimony, in order to warrant a new trial, Plaintiffs would need to show that this violation prevented them from fully and fairly presenting their case to the jury. But as explained in detail above, Plaintiffs' counsel utilized the classic methods available for addressing perceived testimonial inconsistencies: cross-examination,

16

impeachment with prior inconsistent statements, and closing argument. These tools exist so that a party can task the jury with resolving testimonial discrepancies without bringing the trial to a halt. Thus, even if Plaintiffs truly were surprised by Defendants' explanation of the deposition excerpt, Plaintiffs addressed this surprise in the precise methods contemplated by the Federal Rules of Evidence. Plaintiffs have failed to show that they were prevented from fully and fairly presenting their case to the jury because of Defendants' alleged Rule 26 shortcomings.

Finally, as to the Rule 59(a) standard, the Court already concluded that Defendant Carranza's allegedly-inconsistent testimony did not impact the fact that the manifest weight of the evidence supported the jury's findings. Plaintiffs' rebranding of this testimonial inconsistency as a form of attorney misconduct does not alter the Court's conclusion.

### C. Sanctions

In addition to requesting a new trial, Plaintiffs make an audacious request that the Court sanction Defendant Carranza for his false testimony and/or sanction Defendants generally for their failure to supplement discovery. Plaintiffs' request is denied. As mentioned, the Court is not persuaded by Plaintiffs' arguments that Defendant Carranza gave false testimony at trial, nor is the Court aware of any failure by Defendants to supplement their discovery responses.

### D. Plaintiffs' Motion for Post-Trial Discovery

In a separate motion [257], Plaintiffs request leave to take post-trial discovery, including the depositions of Barrett Boudreaux, Arlene Martin, Gail Reich, Kathleen Crawford, Marshall Martin, Caroline Fronczak, Alexander Jason, and Thomas Behan. Plaintiffs assumedly seek to obtain information in support of their theory that Defendant Carranza presented false testimony at trial in order to avoid liability, and that Defendants' attorneys were aware of this change in

testimony but deliberately avoided disclosing this change to Plaintiffs' counsel. Plaintiffs' motion [257] is denied.

While it is within the Court's discretion to allow post-trial discovery, see, *e.g.*, *Colyer v. City of Chicago*, 2016 WL 25710, at *2 (N.D. Ill. Jan. 4, 2016) (allowing post-trial discovery to investigate a discovery violation), the Court concludes that Plaintiffs have failed to make a threshold showing that such discovery is warranted.

As mentioned multiple times throughout this order, the Court is not persuaded by Plaintiffs' argument that Defendant Carranza gave false testimony at trial. Although his trial testimony is arguably inconsistent with his deposition testimony, the deposition excerpt is brief and contains two heavily-leading questions, and when Plaintiffs' counsel impeached Defendant Carranza with this testimony at trial, Defendant Carranza qualified the discrepancy with an explanation of events that was corroborated by multiple, independent evidentiary sources.

Nor is the Court persuaded by Plaintiffs' argument that Defendants violated any of their Rule 26(e) disclosure obligations. The only "change" that Plaintiffs mention is a change in Defendant Carranza's deposition testimony, but Rule 26(e) does not require the amending or correcting of a non-expert deposition. Further investigation of conduct that does not amount to a violation of any identifiable rule is unwarranted.

Plaintiffs also rely heavily on Defendants' withdrawal of their expert as evidence of Defendants' bad faith. Plaintiffs' theory seems to be that after devising a plan to have Defendant Carranza lie on the stand, Defendants realized that the lie would be inconsistent with their expert's testimony,[4] meaning that they had to withdraw the expert in order to preserve their fraudulent scheme. But this theory is predicated on the underlying notion that Defendant

---

[4] Defendants say that their expert's testimony "was a mere redundancy of Carranza's *repeated testimony* that his shooting of Othman was a single continuous event and therefore [the] expert opinion was unnecessary." [254, at 9.]

18

Carranza's testimony was in fact false, which the Court does not accept. In addition, Defendants had discretion to withdraw their expert as a testifying witness at any time, and Plaintiffs' ability to present their case-in-chief was not impeded by the hypothetical testimony of one of Defendants' uncalled witnesses in their rebuttal case. Plaintiffs—who moved unsuccessfully *in limine* to exclude Defendants' expert—retained the ability to call the expert to testify at trial, but elected not to. Ultimately, Plaintiffs have not presented any arguments in any of their post-trial motions indicating any bad faith or wrongdoing by Defendants' counsel, and thus post-trial discovery is not warranted.

**IV.     Conclusion**

For the foregoing reasons, Plaintiffs' motion for new trial [244] is denied and Plaintiffs' motion for post-trial discovery [257] is denied.

Dated: February 16, 2016                         _____
                                                 Robert M. Dow, Jr.
                                                 United States District Judge