1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

ANTONIO LEGRIER, Individually        )
and as Special Administrator of      )
the Estate of QUINTONIO LEGRIER,     )
Deceased,                            )
                                     )
            Plaintiff,               )
                                     )
         -vs-                        )  No. 15 L 12964
                                     )
CITY OF CHICAGO,                     )
                                     )
            Defendant.               )
-------------------------------      )
LATARSHA JONES, Individually and     )  Cons. with
as Special Administrator of the      )
Estate of BETTIE RUTH JONES,         )
Deceased, and LATISHA JONES,         )
                                     )
            Plaintiffs,              )
                                     )
         -vs-                        )  No. 16 L 00012
                                     )
CITY OF CHICAGO,                     )
                                     )
            Defendant.               )


        Videotaped discovery deposition of HILARY

McELLIGOTT, MD, taken under oath on Friday, April 20,

2018, at 70 West Madison Street, Suite 5500, Chicago,

Illinois, pursuant to the Rules of the Supreme Court

of Illinois and the Code of Civil Procedure, before

Laura L. Kooy, Certified Shorthand Reporter

No. 084-002467, RDR, CRR, commencing at 10:08 a.m.

pursuant to notice.

2

1  APPEARANCES:

2       JAMES D. MONTGOMERY AND ASSOCIATES, LTD.
        MR. JOHN K. KENNEDY
3       MR. DANIEL WATKINS, II
        One North LaSalle Street
4       Suite 2450
        Chicago, Illinois  60602
5       (312) 977-0200
        JKennedy@JDMLaw.com
6       DWatkins@JDMLaw.com

7            on behalf of the Plaintiff Antonio LeGrier,
                Individually and as Special
8                Administrator of the Estate of Quintonio
                LeGrier, Deceased;
9
        POWER ROGERS & SMITH, PC by
10      MR. LARRY R. ROGERS, JR.
        MR. JONATHAN M. THOMAS (Page 57)
11      70 West Madison Street
        Suite 5500
12      Chicago, Illinois  60602
        (312) 236-9381
13      LRogersJr@PRSLaw.com
        JThomas@PRSLaw.com
14
             on behalf of the Plaintiff Latarsha Jones,
15               Individually and as Special
                 Administrator of the Estate of Bettie
16               Ruth Jones, Deceased, and Latisha Jones;

17      HALE LAW LLC by
        MS. BARRETT BOUDREAUX
18      53 West Jackson Boulevard
        Suite 330
19      Chicago, Illinois  60604
        (312) 341-9646
20      BBoudreaux@AHaleLaw.com

21           on behalf of the Defendant City of Chicago.

22  ALSO PRESENT:

23      MR. JIM ROSS, Videographer.

24               *    *    *    *    *

3

INDEX

EXAMINATION                                          PAGE

by Mr. Kennedy:                                        5

by Mr. Rogers:                                        53

Further by Mr. Kennedy:                              63

Further by Rogers:                                   66

Further by Mr. Kennedy:                              71

by Ms. Boudreaux:                                    72

                          EXHIBITS

McElligott Exhibit 1                                  6
     Curriculum Vitae

McElligott Exhibit 2                                 16
     McElligott Report

            (Exhibits attached/scanned.)

                *    *    *    *    *

4

1              (McElligott Exhibits 1 and 2 marked.)

2         THE VIDEO TECHNICIAN:  Okay.  Recording.

3              For the record, my name is Jim Ross, from

4    Video Instanter.  I am the video recording device

5    operator for this deposition.

6              Our business address is 134 North LaSalle

7    Street, Suite 1400, Chicago, Illinois, 60602.

8              This deposition is being video recorded

9    pursuant to Illinois Supreme Court Rule 206 and all

10   other applicable state and local rules.

11             We are at 70 West Madison Street,

12   55th Floor, to take the video recorded discovery

13   deposition of Hilary McElligott in the matter of

14   Jones versus City of Chicago, et al., Case

15   Number 2016 L 0012 in the Circuit Court of

16   Cook County, Illinois, County Department, Law

17   Division.

18             Today's date is April 20, 2018, and the

19   time is approximately 10:08 a.m.

20             This deposition is being taken on behalf of

21   the plaintiff, and is being video recorded at the

22   instance of the plaintiff.

23             Will the attorneys present please introduce

24   themselves for the record?

5

1     MR. KENNEDY:  Jack Kennedy on behalf of the

2  LeGrier estate.

3     MR. WATKINS:  Daniel Watkins on behalf of the

4  LeGrier estate.

5     MS. BOUDREAUX:  Barrett Boudreaux on behalf of

6  the City.

7     THE VIDEO TECHNICIAN:  Would the court reporter

8  please introduce herself and swear in the witness for

9  the record.

10     MR. THOMAS:  He's on his way up.

11     THE REPORTER:  My name is Laura Kooy with Urlaub

12  Bowen & Associates.

13               (Witness sworn.)

14               HILARY McELLIGOTT, MD,

15  called as a witness herein, having been first duly

16  sworn, was examined and testified as follows:

17                  EXAMINATION

18  BY MR. KENNEDY:

19     Q    Doctor, could you please begin by stating

20  your name.

21     A    My name is Hilary McElligott.

22     Q    Okay.  I think we're going to go off the

23  record for a second.

24     THE VIDEO TECHNICIAN:  Okay.  We are off the

6

1  record at 10:08 a.m.

2                    (Whereupon, a short recess was taken.)

3                    (Whereupon, Mr. Rogers arrived at the

4                     deposition.)

5      THE VIDEO TECHNICIAN:  We are back on the record

6  at 10:10 p.m. -- a.m., rather.

7  BY MR. KENNEDY:

8      Q    Doctor, you have before you what's been

9  marked as Deposition Exhibit Number 1.  Correct?

10     A    Yes.

11     Q    Could you take a look at that and identify

12  what that is, please.

13     A    This is a copy of my CV.

14     Q    And does Exhibit Number 1, your CV,

15  accurately reflect your professional background and

16  experience?

17     A    Yes.

18     Q    You are currently employed by the DuPage

19  County Coroner's Office as the Chief Forensic

20  Pathologist?  Correct?

21     A    Yes.

22     Q    How long have you held that position?

23     A    Since April of 2013.

24     Q    And how many other forensic pathologists

7

1   are employed by the DuPage County Coroner's Office?

2       A    No other full-time pathologists.

3       Q    Are there contract pathologists?

4       A    Yes.

5       Q    But you are the only pathologist who is

6   employed at DuPage County.  Correct?

7       A    Salaried.  Yes.

8       Q    Are you employed there full time?

9       A    Yes.

10      Q    Is that about 40 hours a week?

11      A    Approximately.

12      Q    My understanding is that in today's case,

13  you are testifying as a private consultant?

14      A    Correct.

15      Q    You are not testifying in your capacity as

16  the Chief Forensic Pathologist of DuPage County then?

17      A    That's correct.

18      Q    And I take it that DuPage County permits

19  you to do this work.  Correct?

20      A    Yes.

21      Q    And can you tell us, generally, are there

22  any conditions imposed on that?

23      A    I just have to be off County time.  So I'll

24  take the day off.

8

1     Q    Would you, for instance, be permitted to

2  consult on a case like you're doing today if it was a

3  case where you did the autopsy at DuPage?

4     A    No.  That would be a conflict of interest.

5     Q    Why would that be a conflict of interest?

6     A    Just because I can't -- if I understand

7  your questioning correctly, I can't represent two

8  different aspects of one case.

9     Q    In other words, if you're the autopsy

10  pathologist, it would be improper for you to act as a

11  paid consultant for one side or the other if the case

12  is in litigation.  Correct?

13     A    Correct.

14     Q    When I last took your deposition in 2013,

15  you told me that you had performed approximately

16  1,200 autopsies in your career.

17          As of today, approximately how many

18  autopsies have you performed?

19     A    Approximately 1,800, 1,850.

20     Q    And are those all full autopsies?  Or are

21  those any postmortem examinations?

22     A    That includes all postmortem exams.

23     Q    So if we were to break it down and say how

24  many are full autopsies, what would be your answer?

9

1     A    I'd say approximately 1,100, 1,200.  Most

2 of them.

3     Q    You testified in mid-2013 that as of that

4 date, you'd performed about 250 autopsies involving

5 gunshot wounds and that 248 of those would have been

6 when you were at the Cook County Medical Examiner's

7 Office.  Correct?

8     A    Yes.

9     Q    Would it be fair to say that when you were

10 at the Cook County Medical Examiner's Office, you

11 would handle cases involving decedents who had fallen

12 victim to gunshot wounds with far more regularity

13 than you do now?

14     A    Yes.

15     Q    Okay.  If it was 250 autopsies back in

16 mid-2013 -- strike that.

17         Can you give me an estimate, as of today,

18 as to how many autopsies you've performed on victims

19 who have fallen -- strike that.

20         Can you tell me how many gunshot wound

21 autopsies you've performed as of today's date?

22     A    It's approximately 300.

23     Q    Approximately how many gunshot wound cases

24 would you handle on an annual basis now at DuPage

10

1    County?

2        A    Far fewer than Cook County.  Most of them

3    are suicidal.  I would say at most 2,000, probably, a

4    year.

5        Q    And presently, how many postmortem

6    examinations would you perform on an annual basis?

7        A    I perform approximately 200.

8             It's highly variable at DuPage compared to

9    Cook County, so it's varied between -- since my

10   employment started there -- 150 -- between about

11   150 to what we're on pace for now to be about 250.

12       Q    Okay.  If you were to give us a breakdown

13   of, generally, what kind of cases you encounter, are

14   the majority traffic crash cases?  What kind of cases

15   do you handle?

16       A    For DuPage County?

17       Q    Correct.

18       A    The majority, at present, are drug overdose

19   cases.  So mostly heroin.  Fentanyl.

20       Q    What would be the second-most common case

21   you'd see?

22       A    Probably various manners of suicide.

23   Hangings.  Train versus pedestrian.  Auto versus

24   pedestrian.  Falls from height.  Just various

11

1    traumatic deaths.

2         Q    How many gunshot wound homicide cases would

3    you handle, on average, a year on behalf of the

4    DuPage County Coroner's Office?

5         A    Again, variable.  They're mostly domestic

6    related.  So between one and five.  Five if it's a

7    bad year.

8         Q    Okay.  Some years one?

9         A    Correct.

10        Q    Any years zero, perhaps?

11        A    I don't think we've had a year where there

12   were none.  No.

13        Q    But generally, it would be between one and

14   five cases where someone has shot someone else that

15   died.  Correct?

16        A    Correct.

17        Q    You are involved in this case because

18   Ms. Boudreaux hired you as a paid consultant.

19   Correct?

20        A    Yes.

21        Q    You've worked for her before in other

22   matters?  Correct?

23        A    I've worked with her.  Yes.

24        Q    Have you ever worked for her as a paid

12

1    consultant before?

2        A    I worked with the City of Chicago on a case

3    that she was involved in.  Yes.

4        Q    And that was a case, like this case, where

5    you were hired as a paid expert.  Correct?

6        A    Correct.

7        Q    In your CV, you list a number of cases

8    where you've given trial testimony.  Correct?

9        A    Yes.

10       Q    And is that list current, as of today, as

11   to all the cases in which you've provided trial

12   testimony as an expert witness?

13       A    Yes, I believe it is.

14       Q    I assume the vast majority of the cases

15   where you've testified as an expert witness in the

16   field of pathology were cases where you actually

17   performed the autopsy?  Is that correct?

18       A    Yes.

19       Q    Are there any cases on this list that you

20   can identify where you were testifying as a paid

21   consultant, as opposed to the autopsy pathologist?

22       A    The one that I was referencing previously

23   is the second to last page, Othman versus City of

24   Chicago.

13

1          And then above that, Ross versus City of

2    Chicago.

3        Q    In Ross versus City of Chicago, you were

4    the autopsy pathologist.  Correct?

5        A    Oh, yeah, maybe I was.  Sorry.  I can't

6    recall.

7        Q    If I tell you that you did the autopsy --

8        A    I can't recall.  Yes.

9        Q    And actually, you were served a trial

10   subpoena by both sides.  Correct?

11       A    I'd have to take your word for it.  I'm

12   sorry.  They all blend together after a while.

13   Sorry.

14       Q    My office has never hired you as a paid

15   consultant.  True?

16       A    Not as a consultant.  No.

17       Q    We have compensated you for your time when

18   you've testified to your autopsy findings before.

19   Correct?

20       A    Yes.

21       Q    And at deposition and at trial.  Correct?

22       A    Correct.

23       Q    And that's because you were the autopsy

24   pathologist.  Correct?

14

1      A     Yes.

2      Q     You identified the Othman case as a case

3  where you worked with Ms. Boudreaux before?  Correct?

4      A     Yes.

5      Q     And you were a paid consultant in that

6  case?

7      A     Correct.

8      Q     You did not perform the autopsy in that

9  case?

10     A     No.

11     Q     And you testified at trial in that matter?

12  Correct?

13     A     Correct.

14     Q     And you met with Ms. Boudreaux to prepare

15  your trial testimony in that case?  Correct?

16     A     Yes.

17     Q     Ms. Boudreaux brought into court a foam

18  dummy?  Correct?

19     A     Yes.

20     Q     And you used trajectory rods that you

21  placed through the dummy to illustrate the various

22  paths of trajectories in that case.  Correct?

23     A     Yes.

24     Q     And one of the trajectories was through the

15

1    decedent's arm?  Correct?

2        A    Possibly.  I don't recall specifics.

3        Q    And you gave testimony regarding the

4    positioning of the arm at the time of the shooting.

5    Correct?

6        A    Possibly.  I don't recall specifics.

7        Q    Other than the Othman case, has

8    Ms. Boudreaux hired you before as a paid consultant?

9        A    I don't believe so.

10       Q    So your recollection is that aside from

11   this case, you've only worked with Ms. Boudreaux on

12   one other case, and that was the Othman case.

13   Correct?

14       A    I was trying to remember if I have worked

15   with her on one prior to that.  I couldn't come up

16   with anything solid in my memory.

17       Q    So to the best of your recollection,

18   there's only the one other case that you've worked

19   with Ms. Boudreaux on before, and that was the

20   Othman case.  Correct?

21       A    I believe so.  Yes.

22       Q    Are you and Ms. Boudreaux Facebook friends?

23       A    Yes, we are.

24       Q    You've commented on some of the family

16

1  photos she's posted?  Correct?

2       A    Possibly.

3       Q    And other than working with her on the

4  Othman case, did you have any prior contact with

5  Ms. Boudreaux?

6       A    As I mentioned, it may have been through

7  another case, but I don't recall specifically.

8       Q    I guess what I'm getting at is, you didn't

9  know her before you became involved in cases where

10  she was representing one side or the other.  Correct?

11      A    Oh.  No.

12      Q    My statement's correct.  Yes?

13      A    Yes.  Correct.

14      Q    You have before you what's been marked as

15  Deposition Exhibit Number 2.

16           If you'd take a look at that and identify

17  it for us, please.

18      A    This is a copy of the report I prepared in

19  this case for Ms. Boudreaux.

20      Q    And the report accurately and completely

21  sets forth the materials that you reviewed?  Correct?

22      A    Yes.

23      Q    The report accurately and completely

24  reflects all of the opinions you've formed to a

17

1   reasonable degree of certainty within your field of

2   expertise?  Correct?

3        A    Yes.

4        Q    Doctor, there is no anatomic reason, that

5   you are aware of, that would have prevented pain

6   signals from being transmitted through Mr. Quintonio

7   LeGrier when he sustained his gunshot wounds.

8   Correct?

9        A    I don't know that I understand the

10  question.

11           Could you rephrase?

12       Q    Okay.  It's your opinion in this case that

13  Quintonio LeGrier likely did suffer some modicum of

14  conscious pain and suffering.  Correct?

15       A    I don't believe that it's possible to

16  specifically state, one way or the other, if there

17  was conscious pain and suffering.

18       Q    You have no opinion, within a reasonable

19  degree of medical certainty, as to whether Quintonio

20  LeGrier suffered any conscious pain and suffering.

21  Correct?

22       A    Correct.

23       Q    Are you aware of any anatomic reason, in

24  terms of the gunshot trajectories to Mr. LeGrier's

18

1    body, that would have inhibited or prevented him from

2    having pain signals transmitted?

3        A    Are you referring to prior to the incident?

4    Or -- if you'd --

5        Q    If a gunshot -- sure.  I'll rephrase it.

6             If a gunshot wound victim is struck and

7    their spinal cord is completely severed, that would

8    be an anatomic reason why pain signals would not be

9    able to be transmitted.  Correct?

10       A    Yes.  Most likely.

11       Q    Are you aware of any anatomic reason in

12   this case why Mr. LeGrier would not have been able to

13   have pain signals transmitted?

14       A    There is no certain autopsy finding that

15   would indicate that.  In my opinion.

16       Q    So based on the autopsy findings alone,

17   there's no reason to believe that Quintonio LeGrier

18   would have immediately lost consciousness at the time

19   that he was struck by Officer Rialmo's bullets.

20   Correct?

21       A    Consciousness now?  No, there is no

22   indication that he would have immediately lost

23   consciousness.  No.

24       Q    Similarly for Bettie Jones, there's no

19

1    indication, based on the autopsy findings, that she

2    would have immediately lost consciousness at the time

3    she was struck by Officer Rialmo's bullet.  Correct?

4        A    No anatomic reason.  Correct.

5        Q    On page 11 of your report, you say that

6    it's likely that Mr. LeGrier would have lost

7    consciousness in less than one minute?

8        A    Yes.

9        Q    Would you agree with me that there was some

10   interval of time, be it seconds or minutes, when

11   Mr. LeGrier would have still been conscious after

12   being struck by the bullets?  To a reasonable degree

13   of certainty.

14       A    Yes, I believe within a reasonable degree.

15       Q    And based on the autopsy findings alone,

16   there's no way to quantify that exact interval of

17   time, other than to say it could have been as short

18   as seconds and as long as minutes.  Correct?

19       A    That's correct.

20       Q    And, really, the only way to be more

21   precise about the interval of time during which

22   Mr. LeGrier would have suffered conscious pain and

23   suffering would be to consider eyewitness testimony

24   about his consciousness.  Correct?

20

1        A     That's correct.

2        Q     In this case, you did not review the

3   deposition of Antonio LeGrier.  Correct?

4        A     I'll have to refer to the --

5        Q     Please do.

6        A     No.  I did not.

7        Q     You were not provided with, and you did not

8   review, the deposition testimony of Latisha Jones.

9   True?

10       A     No, I don't believe that I did.

11       Q     If Antonio LeGrier described his son being

12   conscious for some time after the shooting, that

13   would be information that could help inform your

14   opinions as to how long Quintonio LeGrier was

15   conscious.  Correct?

16       A     Yes.

17       Q     If Latisha Jones described holding her

18   mother in her arms and her mother telling her that

19   she loved her after the shooting, that would be

20   information that could help inform your opinions as

21   to how long Bettie Jones was conscious after the

22   gunshot wound was sustained.  Correct?

23       A     Yes.

24       Q     But you were unable to take into

21

1    consideration the deposition testimony of Antonio

2    LeGrier and Latisha Jones in forming your opinions,

3    because Ms. Boudreaux did not provide you with those

4    materials.  Correct?

5        A    I did not have those materials to review.

6    Correct.

7        Q    Who decided that you would not review the

8    deposition testimony of Antonio LeGrier?

9        A    I don't know the answer to that question.

10       Q    And your answer would be the same if I

11   asked you about the deposition of Latisha Jones, I

12   presume.  Correct?

13       A    Yes.  Correct.

14       Q    You did not review the autopsy x-rays in

15   this case?

16       A    Correct.

17       Q    When you were working at the Cook County

18   Medical Examiner's Office, you would have -- strike

19   that.

20            Currently, at DuPage County, you would

21   review the x-rays for the decedent you were

22   performing an autopsy on prior to signing your

23   report.  Correct?

24       A    Correct.

22

1    Q    Radiographic examination of a decedent is

2  an important part of the autopsy protocol.  Correct?

3    A    Yes.  It's a portion of it.

4    Q    And it's an important portion of it.

5  Correct?

6    MS. BOUDREAUX:  I'll just object to incomplete

7  hypothetical.

8  BY MR. KENNEDY:

9    Q    Okay.  Is radiographic examination of a

10 decedent an important part of the autopsy protocol,

11 in your opinion, as a forensic pathologist?

12   A    I believe that it is -- yes.  It is an

13 important portion of the autopsy.

14   Q    And that important information was

15 unavailable to you in this case.  Correct?  Well, let

16 me withdraw that.

17        That important information, the

18 radiographic examinations of Mr. LeGrier and

19 Ms. Jones, those x-rays were not something that you

20 reviewed.  Correct?

21   A    I did not review them.

22        I did review the interpretation of them.

23   Q    But you would not -- strike that.

24        The point of you, I assume, of being a paid

23

1  consultant in this case is to conduct your own

2  independent review of the autopsy findings.  Correct?

3      A    Correct.

4      Q    And you could not review the validity of

5  the autopsy pathologist's interpretation of the

6  radiographic films because you did not review them.

7  True?

8      A    Correct.  I did not review them.

9      Q    Okay.  And who decided that you would not

10  review the x-rays of Quintonio LeGrier?

11      A    I don't know the answer to that.

12      Q    Who decided that you would not review the

13  x-rays of Bettie Jones?

14      A    Again, I don't know the answer to that.

15      Q    You consider Spitz and Fisher's Medicolegal

16  Investigation of Death an authoritative treatise in

17  your field of specialty.  Correct?

18      A    It's not necessarily something I rely upon

19  verbatim.  But, yes, it is helpful in interpreting --

20      Q    Did you consider it to be --

21      A    -- the --

22      Q    I'm sorry, I interrupted.

23          Do you consider it to be a reliable text in

24  the field of forensic pathology?

24

1    A    I do.  Yes.

2    Q    It was one of the texts that you were

3  trained on.  Correct?

4    A    Yes.

5    Q    You also consider the book Gunshot Wounds

6  by Vincent Di Maio to be an authoritative text in

7  your field.  Correct?

8    A    Again.  A reliable text.  Yes.

9    Q    Mr. Di Maio uses the term powder

10  stippling -- strike that.

11        Mr. Di Maio uses the term powder tattooing

12  to refer to stippling.  Correct?

13    A    I believe he does.  Yes.

14    Q    And would you agree, Doctor, that depending

15  on the firearm and the ammunition, powder tattooing

16  can be seen at a distance of up to 3 feet?

17    A    It, as you may have just mentioned, depends

18  on the weapon test-fired with the specific

19  ammunition.

20        I have been trained and taught that while

21  some reference texts do mention that, that

22  realistically, 24 inches is the upper range for close

23  range of fire.

24    Q    Other than what you've been told, have you

25

1    ever done any independent testing of your own to

2    determine that?

3        A    No.

4        Q    That would be more of the province of a

5    ballistics expert?

6        A    Yes.

7        Q    So as you sit here today, you do not have

8    an opinion, within a reasonable degree of medical

9    certainty, as to the maximum distance between the

10   muzzle and the victim where stippling can be seen.

11   True?

12       MS. BOUDREAUX:  I'll --

13   BY MR. KENNEDY:

14       Q    Because it depends on the ammunition and

15   the firearm.  Correct?

16       MS. BOUDREAUX:  I'll object to the form of that

17   question.  And as mischaracterizing her testimony.

18   BY MR. KENNEDY:

19       Q    You can go ahead and answer.

20       A    I'm sorry, can you restate?

21       Q    Sure.  You said that you've read in texts

22   that it can be 3 feet, but you've also heard that it

23   can be 24 inches.  Correct?

24       A    Yes.

26

1    Q    And you don't have an opinion, within a

2  reasonable degree of medical certainty, as to whether

3  it's 3 feet or 24 inches.  Correct?

4    MS. BOUDREAUX:  I'll --

5  BY MR. KENNEDY:

6    Q    Because it depends on the ammunition.

7  Correct?

8    MS. BOUDREAUX:  I'm going to object to the form

9  of that question.  Compound.  And mischaracterizing

10  her testimony.

11    THE WITNESS:  I consider 24 inches to be the

12  upper range for close range of fire.

13  BY MR. KENNEDY:

14    Q    But you certainly do not disagree with the

15  medical literature that you consider reliable in your

16  field which indicates that it can be up to 3 feet.

17  Correct?

18    MS. BOUDREAUX:  Objection.  Mischaracterizes her

19  testimony.

20    THE WITNESS:  The texts do say that.  And I

21  can't change that.  I'm sure they have their

22  reasoning for it.

23        But my training and experience has

24  indicated 24 inches to be the upper limit for close

27

1  range of fire.

2  BY MR. KENNEDY:

3      Q    You have no basis for disagreeing with the

4  proposition that it may be seen up to 3 feet.

5  Correct?

6      MS. BOUDREAUX:  Objection.  Asked and answered.

7  Same objections.

8          Answer one more time.

9      THE WITNESS:  Again, there are texts that do

10  state that it can be.  And, again, that would be very

11  specific, depending on the weapon test-fired with the

12  exact ammunition.

13          So it's very dependent on circumstances.

14  BY MR. KENNEDY:

15      Q    And I understand that.  And I'm saying, you

16  don't -- strike that.

17          I noticed in your report you used the term

18  "significant" in the context of conscious pain and

19  suffering.  Is that correct?

20      A    I did.  Yes.  On page 11.

21      Q    Is there a standard definition, in your

22  field of specialty, as to what constitutes, quote,

23  significant and, quote, conscious pain and suffering?

24  Or is that your own subjective description in this

28

1    case?

2        A    That's a subjective description.

3        Q    Your subjective value judgment is that

4    Quintonio LeGrier's conscious pain and suffering was

5    insignificant.  Correct?

6        MS. BOUDREAUX:  I'll just object to that

7    characterization.

8            You can answer.

9        THE WITNESS:  I wouldn't state that.  No.

10   That's not the word I would choose as its opposite.

11   BY MR. KENNEDY:

12       Q    Okay.  Your subjective value judgment is

13   that Mr. LeGrier did not sustain significant

14   conscious pain and suffering.  Correct?

15       A    Could you -- I'm sorry, could you state

16   that again?

17       Q    Sure.  Your subjective opinion is that

18   Mr. LeGrier did not sustain significant conscious

19   pain and suffering.  Correct?

20       A    Correct.

21       Q    And your opinion is that Bettie Jones was

22   struck by one of Officer Rialmo's bullets?  Correct?

23       A    Yes.

24       Q    And the bullet wound trajectory was

29

1   through -- strike that.

2         The bullet wound trajectory through Bettie

3   Jones' chest was downward.  Correct?

4     A    I believe so.  Yes.

5     Q    And it's your opinion, to a reasonable

6   degree of medical certainty, that Ms. Jones' body was

7   likely leaned forward when she sustained the gunshot

8   wound to the chest?  Correct?

9     A    It's consistent with that positioning.

10  Yes.

11     Q    And Ms. Jones' leaned forward body position

12  would be consistent with her ducking or attempting to

13  get on the ground.  Correct?

14     A    It could be.  Yes.

15     Q    And that would be your opinion to a

16  reasonable degree of medical certainty in your field

17  of specialty.  Correct?

18     A    Yes.

19     Q    Your opinion is that Quintonio LeGrier was

20  struck by a minimum of five and a maximum of six of

21  Officer Rialmo's bullets?  Correct?

22     A    That's correct.

23     Q    Okay.  You do not know whether it was five

24  or six bullets that struck Quintonio LeGrier.  True?

30

1      A      Correct.

2      Q      In your opinion, it's not possible to

3   determine the exact positioning of the arm, relative

4   to the weapon, at the time of the shooting because

5   the arm is a mobile part of the body?  Correct?

6      A      That's correct.

7      Q      You, therefore, have no opinion, within a

8   reasonable degree of medical certainty, as to the

9   exact position of Quintonio LeGrier's left arm at the

10  time of the shooting.  True?

11     A      Correct.

12     Q      As I understand your opinion, there are

13  many possible positions in which Quintonio LeGrier's

14  left arm could have been in at the time he sustained

15  the gunshot wound to his left arm.  Correct?

16     A      Yes.

17     Q      Some of the possible ways in which

18  Quintonio LeGrier's left arm could have been

19  positioned during the shooting would be consistent

20  with Officer Rialmo's testimony?  Is that your

21  opinion?

22     A      I believe so.  Yes.

23     Q      It's equally possible that Quintonio

24  LeGrier's left arm could have been in a position that

31

1   is inconsistent with Officer Rialmo's testimony.

2   True?

3       MS. BOUDREAUX:  I'll object to the form of the

4   question.

5           You can answer, if you understand that.

6       THE WITNESS:  I'm not comfortable answering

7   that.  I guess I would need more specific information

8   as to what the scenario would be.

9   BY MR. KENNEDY:

10      Q    It's your opinion in this case that there

11  are many possible bullet trajectories that may have

12  occurred with respect to Mr. LeGrier's left arm

13  positioning.  Correct?

14      A    Yes.

15      Q    Some of those possibilities would be

16  consistent with Officer Rialmo's testimony.  Some of

17  the other possibilities would be inconsistent with

18  his testimony.  Correct?

19      MS. BOUDREAUX:  Same objection.  Calls for

20  speculation.  Form.  Incomplete hypothetical.

21      THE WITNESS:  I'm -- if there's -- I have

22  specific scenarios, because I understand what

23  Officer Rialmo's depositions say.

24           But I don't know how to answer that

32

1  question, because I don't know what you're asking me.

2  I don't know where you're asking as far as the arm

3  position goes.

4        Like I can answer a specific scenario for

5  you.  But I don't feel comfortable answering a large,

6  vague question like that because I just -- I don't

7  understand it.

8  BY MR. KENNEDY:

9    Q    Okay.  It would be pure speculation for you

10 to say that Quintonio LeGrier's arm, in fact, was

11 positioned in the manner in which Officer Rialmo

12 described.  Correct?

13    MS. BOUDREAUX:  I'll object to the form.  "Pure

14 speculation."

15    THE WITNESS:  I disagree.

16        And the whole basis of my opinion is based

17 on the autopsy findings.  Not just speculation.

18 BY MR. KENNEDY:

19    Q    Well, I understand that.

20        My point is that you cannot say, to a

21 reasonable degree of medical certainty, that

22 Quintonio LeGrier's arm was in a position that is

23 consistent with Officer Rialmo's testimony.  True?

24    MS. BOUDREAUX:  Objection.  Mischaracterizes

33

1   what she just testified to.

2       THE WITNESS:  I can't state for certain exactly

3   what position it was in.  That's -- that's my

4   statement.

5   BY MR. KENNEDY:

6       Q    And given that you don't know exactly what

7   position the arm was in, you can't say whether it

8   matches or does not match Officer Rialmo's testimony.

9   True?

10      MS. BOUDREAUX:  I'm just going to object to

11  mischaracterizing her testimony.

12          You can explain.

13      THE WITNESS:  If I -- again, if I had a specific

14  scenario that you're trying to get me to answer, I

15  would be able to answer it.

16          But I -- I don't know if I'm answering your

17  question correctly.  Can you rephrase it?  Because I

18  feel like you're just asking me to answer a vague

19  question.  And I'm just really uncomfortable with the

20  form, I guess.

21  BY MR. KENNEDY:

22      Q    Well, you do not know how Quintonio

23  LeGrier's arm was positioned at the time of the

24  shooting.  True?

34

1    A    True.

2    Q    Therefore, you don't know whether it

3  matches Officer Rialmo's -- strike that.

4        Therefore, you do not know whether

5  Quintonio LeGrier's arm was positioned as described

6  by Officer Rialmo.  True?

7    MS. BOUDREAUX:  Same objection to the form.

8    THE WITNESS:  I can say that it is consistent

9  with what he is describing.

10 BY MR. KENNEDY:

11   Q    It could also be inconsistent with what he

12 is describing.  True?

13   MS. BOUDREAUX:  Objection.  Calls for

14 speculation.

15   MR. KENNEDY:  If you'll stipulate that it calls

16 for speculation, her whole opinion as to consistent

17 or inconsistent calls for speculation.

18   MS. BOUDREAUX:  No.

19   THE WITNESS:  Based on the information I have, I

20 don't -- I believe it's consistent.  I don't know how

21 else to answer that question without more specific --

22 I'm not trying to be difficult.  I just really,

23 honestly, don't know how to answer that question

24 reasonably without more specific information.

35

1   BY MR. KENNEDY:

2       Q    You're comfortable saying that

3   Officer Rialmo's testimony is consistent with the

4   gunshot trajectory to Quintonio LeGrier's left arm,

5   even though you do not know how Quintonio LeGrier's

6   left arm was positioned.  Correct?

7       A    I was not there, so I did not witness it.

8   That's correct.

9            But based on the description of events that

10  I have reviewed and the autopsy findings, I feel that

11  everything combined makes those injuries consistent

12  with the description of the events.

13      Q    But you don't actually know where the arm

14  was positioned.  Correct?

15      MS. BOUDREAUX:  Asked and answered.  She's not

16  going to answer that anymore.

17           She already answered it a number of times.

18  BY MR. KENNEDY:

19      Q    How can you say that Quintonio LeGrier's

20  arm positioning is consistent with Officer Rialmo's

21  description if you do not know how his arm was

22  positioned?

23      A    Because I'm using the description as my

24  understanding of how the arm was positioned.

36

1    Q    Which description?

2    MS. BOUDREAUX:  Object to vague.

3    THE WITNESS:  Could you be more specific?

4  BY MR. KENNEDY:

5    Q    You said that Officer Rialmo's description

6  was consistent with the injury.  And I'm asking you

7  what specific description offered by Officer Rialmo

8  are you relying on?

9    A    There is not one that I can pick.  I've

10  reviewed multiple documents.  And in reviewing them

11  as a whole, the picture that's created in the

12  depositions that were given are what I took into

13  consideration.  I can't point to one specific.

14    Q    Did you find in your review of material

15  that Officer Rialmo's description of the events was

16  consistent with his other descriptions of the same

17  events?

18    A    They were not word for word exact, no.

19    Q    Well, for example, you reviewed

20  Officer Rialmo's IPRA statement.  Correct?

21    A    I believe so.  Yes.

22    Q    Starting on page 3, there are summaries of

23  information that was contained within the IPRA

24  statement.  Correct?

37

1      A      Yes.

2      Q      Now, did you actually review the

3  IPRA statement and type out these descriptions?  Or

4  did you copy them from somewhere?

5      A      No, I reviewed them.

6      Q      Okay.  And these are all your words?

7      A      So are you referring to my report?

8      Q      Yes.

9      A      Yes.

10     Q      Page 3 of the report.

11     A      I did that myself.  Yes.

12     Q      Okay.  Because it's quite a lengthy summary

13  you provide of the IPRA statement.  Correct?

14     A      Correct.

15     Q      And before you looked like you were a

16  little unsure as to whether you had reviewed his

17  IPRA statement or not.  That's why I was asking.

18     A      I just don't want to misspeak.

19     Q      I appreciate that.

20            In his IPRA statement, Officer Rialmo told

21  the investigators that he was off the stairs.  Not on

22  the stairs.  But on the concrete walkway when he

23  started firing his weapon.  Correct?

24     A      Yes.

38

1    Q    And then in his deposition, he changes that

2  and says that he was on the stairs when he started

3  firing his weapon.  Correct?

4    A    I believe so.  Yes.

5    Q    And those two facts are irreconcilable.

6  Right?

7    A    The fact that he said different things?  Is

8  that what you're referring to?

9    Q    The two accounts.  That he's not on the

10  stairs, and then the other account where he says he's

11  on the stairs, those are -- they can't both be true.

12  Correct?

13    MS. BOUDREAUX:  Well, I'll just object to vague

14  as to time frame.

15    MR. KENNEDY:  Okay.

16    MS. BOUDREAUX:  And calling for speculation.

17  BY MR. KENNEDY:

18    Q    We talked earlier about the fact that in

19  his IPRA statement, Officer Rialmo said that he was

20  off the stairs when he started firing his weapon.

21  Correct?

22    A    I believe so.

23    Q    And then in his deposition, where did he

24  say he was when he fired his first shot?

39

1      A     I don't remember specifically.

2      Q     Did you read the deposition of

3   Officer Rialmo?

4      A     I did.

5      Q     Did you read both parts of that deposition?

6      A     Yes, I did.

7      Q     And in his deposition -- well, strike that.

8            If you look at your report, are you able to

9   refresh your recollection as to where Officer Rialmo

10  says he was in his deposition at the time he fired

11  his first shot?

12     A     In -- on page 5 of my report, Number 3, he

13  states he fired while he was on the porch.  And then

14  between there and the walkway.

15     Q     So based on your review of Officer Rialmo's

16  deposition, it was your understanding that

17  Officer Rialmo was on the top porch at the time he

18  fired his first shot.  Correct?

19     A     In his deposition, that's what is

20  indicated.  Yes.

21     Q     And that's obviously inconsistent with him

22  firing his first shot when he's off the stairs on the

23  concrete walkway.  Correct?

24     A     Yes.  I can't disagree with that -- that

40

1    those are two different statements.

2        Q    And you've reviewed the crime scene

3    photographs in this matter?

4        A    I have seen -- I don't know if I've seen

5    all of them.  But I have seen some.  Yes.

6        Q    Do you know which ones you looked at and

7    which you didn't?

8        A    The overall porch/walkway steps photograph

9    with the casing tents.

10       Q    You didn't review the photographs inside

11   the house that showed the various blood pools?

12       A    I did see those.  Yes.

13       Q    Mr. LeGrier sustained a graze wound to the

14   back of his right shoulder?  Correct?

15       A    Yes.

16       Q    To a reasonable degree of medical

17   certainty, for Mr. LeGrier to sustain the wound to

18   the back of his shoulder, the barrel of the offending

19   weapon would have been pointed at his back.  True?

20       A    Relative to the weapon, yes, the barrel is

21   pointing towards the back side of the decedent,

22   Mr. LeGrier.  Correct.

23       Q    And also with respect to the wound that

24   partially transected Mr. LeGrier's spinal column,

41

1    that wound was sustained while Mr. LeGrier's back was

2    facing the barrel of the offending weapon, to a

3    reasonable degree of medical certainty.  Correct?

4         A    Yes.

5         Q    The gunshot wound to Mr. LeGrier's

6    buttocks, that, to a reasonable degree of medical

7    certainty, was sustained when the offending weapon's

8    barrel was pointed at Mr. LeGrier's back, or the

9    posterior aspect of his body.  Correct?

10        A    That is how they were, relative to one

11   another, yes.

12        Q    Officer Rialmo testified that he fired all

13   of his shots in under a second.  Correct?

14        A    I believe that's true.  Yes.

15        Q    Officer Rialmo also testified that

16   Quintonio LeGrier was facing him when he started

17   shooting.  Correct?

18        A    Yes.

19        Q    And Officer Rialmo clarified in his

20   deposition testimony that by facing him, he meant

21   that the front of Quintonio LeGrier's torso was

22   facing the front of Officer Rialmo's torso.  Correct?

23        A    Yes, I believe he said that.

24        Q    If Mr. LeGrier was moving directly towards

42

1  Officer Rialmo with the front of his torso directly

2  in line with the offending weapon, he would, to a

3  reasonable degree of medical certainty, have

4  sustained a straight-on gunshot wound.  Correct?

5      MS. BOUDREAUX:  Well, object to incomplete

6  hypothetical and vague as to time frame.

7  BY MR. KENNEDY:

8      Q    She's answered that in other cases.

9           Go ahead.

10     A    Can you, I guess, be more specific with the

11  scenario?

12     Q    If Mr. LeGrier was front-facing the officer

13  in that his torso, the front of his torso, was facing

14  the front of the officer's torso.  Do you understand

15  what I mean by front-facing --

16     A    Yes.

17     Q    -- if I give you that definition?

18     A    I do.

19     Q    If Mr. LeGrier was front-facing the

20  officer, and the officer was holding his weapon at

21  his side or in front of him, pointing towards

22  Mr. LeGrier, Mr. LeGrier, to a reasonable degree of

23  medical certainty, would have sustained a straight-on

24  gunshot wound.  Correct?

43

1    A    If it was at straight-on, as I think you're

2  describing like this, 90-degree angle, and he fired

3  at the same time that the victim was facing him,

4  perpendicular -- (indicating) -- then in that

5  hypothetical situation, yes, it would be a

6  front-facing gunshot wound.

7    Q    And if Mr. LeGrier was front-facing the

8  officer and the officer was holding his weapon in

9  front of the officer, it would be a front-facing

10 gunshot wound?

11   MS. BOUDREAUX:  Asked and answered.

12       You can answer again.

13   THE WITNESS:  I don't -- I don't use the term

14 specific -- I mean, in my reports, I don't

15 necessarily use that term.

16       But, again, yes, if the individual, the

17 victim in question, were standing at -- standing

18 straight and the barrel of the gun is pointed towards

19 the front of the victim as you're indicating, at a

20 90-degree angle relative to the victim, then, yes,

21 that would be a gunshot wound to the anterior front

22 aspect of the body.

23 BY MR. KENNEDY:

24   Q    If Mr. LeGrier were front-facing the

44

1    officer at the time the officer fired his weapon,

2    Mr. LeGrier would sustain a markedly front-to-back

3    gunshot wound, to a reasonable degree of medical

4    certainty.  Correct?

5        MS. BOUDREAUX:  Objection to incomplete

6    hypothetical and vague.

7        THE WITNESS:  I, again, don't think there's

8    enough information.  I think you're asking me that if

9    that exact situation played out, is that what would

10   be seen at autopsy.  And I would say that if -- I

11   don't want to assume that's what you're asking.

12        Could you ask me specifically?

13   BY MR. KENNEDY:

14       Q    What additional details would you need in

15   order to determine whether Mr. LeGrier was

16   front-facing Officer Rialmo, and Officer Rialmo fired

17   a shot at his chest, whether it would be a markedly

18   front-to-back gunshot wound, to a reasonable degree

19   of medical certainty?

20       A    The most important details would be -- if

21   you're trying to determine the location of the victim

22   to the shooter, would be the orientation of the

23   victim and the orientation of the shooter and then

24   the angle at which the gun is located relative to the

45

1   victim.

2        Q    Okay.  Do you understand if I'm -- I'm

3   saying that Mr. LeGrier was front-facing the officer.

4   What additional information would you need with

5   regard to the orientation of Mr. LeGrier?  In order

6   to answer the question.

7        A    I don't even know what question I'm

8   answering right now, to be honest.  I'm sorry.

9             I'm not trying to be difficult.  I just --

10  I'm getting ...

11       Q    There's no evidence of any intermediary

12  targets in this case.  Correct?

13       A    Correct.

14       Q    There's no evidence of any deflection or

15  deviation in the bullet wound paths for either of the

16  victims.  Correct?

17       A    Correct.

18       Q    So assuming there's no intermediary targets

19  and the victim is front-facing the shooter --

20       A    Okay.

21       Q    -- are we good so far?

22       A    Yes.

23       Q    Okay.  Wouldn't firing that gun create a

24  front-to-back trajectory?

46

1    MS. BOUDREAUX:  Still object to incomplete

2    hypothetical.

3        THE WITNESS:  It depends on where the gun is

4    relative to the victim.

5            So if the shooter is above the victim, it's

6    going to be a downward trajectory.

7            If he's below, it will be upward.

8            If he's on a level, relatively level angle,

9    it would be front to back I guess is what you --

10   BY MR. KENNEDY:

11       Q    But whether it's downward or upward or on

12   the same plane, it's still front to back.  Correct?

13       A    Yes.

14            Is that what you're asking?

15       Q    Yes.

16       A    If it's front to back?  Yes.

17       Q    I'm just asking about front to back.  I'm

18   not asking about angled upward or angled downward.

19       A    Okay.  Then, yes, if it's front to back,

20   the gun needs to be in the front of the victim if

21   you're going to see -- and I'm referring just to

22   the -- you're asking about the torso --

23       Q    Correct.

24       A    -- relative to the weapon --

47

1      Q     Correct.

2      A     -- in this very stationary hypothetical

3  situation.

4            So if the gun is at a 90-degree angle to a

5  stationary torso that is 180 degrees, then, yes,

6  front to back.

7      Q     And the angles could be different and it

8  would still be front to back.  It could be upwards or

9  downwards but it would still be front to back.

10 Correct?

11     A     Well, if the torso is moving, it wouldn't

12 necessarily be front to back.  The torso can twist

13 from side to side.  (Indicating.)

14     Q     Right.  But if Quintonio LeGrier is

15 front-facing the officer, meaning his torso is facing

16 the officer, if the officer shoots him with a gun, it

17 would create a front-to-back trajectory.  Right?  A

18 markedly front-to-back trajectory?

19     A     Again, if the torso -- if the front of the

20 torso is facing the barrel of the gun, yes.

21           But I can't assume that in this case,

22 because this is a -- a fluid and progressive

23 situation.  It's not like Mr. LeGrier, in my

24 understanding, is standing still and Officer Rialmo

48

1   is standing still.  There are body movements to take

2   into consideration like the torso which is, you know,

3   capable of twisting.  So I have to consider that in

4   this situation.

5       Q   And the torso's also capable of not

6   twisting.  Correct?

7       A   Correct.  Which is why I said, in a

8   hypothetical scenario, when it's stationary, and the

9   gun is pointed at a 90-degree angle to a stationary

10   torso that is facing it, then, yes, you could see a

11   front-to-back trajectory.

12       Q   Not that you could see.  You would see, to

13   a reasonable degree of medical certainty, that.

14   Correct?

15       A   Yes.  Yes.

16       Q   Okay.

17       MS. BOUDREAUX:  Do you want a break?  Let's take

18   a bathroom break.

19       MR. KENNEDY:  Okay.

20       MS. BOUDREAUX:  Okay?

21       THE VIDEO TECHNICIAN:  We are off the record at

22   10:55 a.m.

23               (Whereupon, a short recess was taken.)

24       THE VIDEO TECHNICIAN:  We are back on the record

49

1   at 11:01 a.m.

2   BY MR. KENNEDY:

3       Q    How wide or narrow is the spinal cord of an

4   adult male at the area of L1-L2?

5       A    I don't know what the specific anatomic

6   textbooks would say.  I would estimate it maybe

7   .4-inch, .5-inch.  That's just an estimation.  I

8   don't remove that area of the spinal cord routinely.

9       Q    A half inch at the most?

10      A    That's just an estimate on my part.  A

11  guess.

12      Q    That's a best estimate?

13      A    It's a guesstimate.  Yes.

14      Q    Well, I don't want you to guess.  So if you

15  don't have an opinion, within a reasonable degree of

16  medical certainty, as to the width or narrowness of

17  an adult male's spinal cord at L1-L2, tell me that.

18  Otherwise, if the half an inch --

19      A    Well, I can't be very specific about it.

20  So I will not give you an exact measurement.  How's

21  that?

22      Q    Can you give me a best approximation?

23  Would it be the half inch you testified to?

24      A    Again --

50

1  Q Or are you guessing?

2  A Well, I'm -- I don't take out very many.  I

3 would say I've taken out three or four.  So I don't

4 really want to give you an exact measurement.

5  Q It's a fragile part of the body?

6  A Yes.

7  Q If you sustain a traumatic injury to the

8 spinal cord, those injuries are normally

9 life-threatening, paralyzing, or have other severe

10 consequences for the victim.  Correct?

11  MS. BOUDREAUX:  Object to incomplete

12 hypothetical.

13  THE WITNESS:  Depending on the level of the

14 spinal cord injury, it does have different

15 consequences.  But it's not a good thing to have a

16 spinal cord injury.  Correct.

17 BY MR. KENNEDY:

18  Q As a projectile fired from a 9-millimeter

19 semi-automatic weapon travels through the body, does

20 it create a cone or a path of damage within the body?

21  A All bullet wounds do create an elastic

22 tunnel through them as they pass through the body.

23 So, yes, a 9-millimeter would as well.

24  Q And that elastic tunnel is an area of

51

1    damage within the body.  Correct?

2        A    Correct.

3        Q    And I assume a 9-millimeter projectile, in

4    your experience, creates a wider than 9-millimeter

5    area, tunnel, of damage?

6        A    Yes.  The energy dissipates beyond the

7    actual bullet itself.

8             If that's what you're asking.

9        Q    It is.

10            Are you able to give us some sense of how

11   wide or narrow that tunnel of damage is in the

12   context of a 9-millimeter projectile?

13       A    Not specifically, no.

14       Q    We know that one of the shots to

15   Mr. LeGrier partially transected his spinal column.

16   Correct?

17       A    Yes.

18       Q    And as I understand your opinion, you don't

19   know, to a reasonable degree of medical certainty,

20   whether or not that wound would have caused

21   Mr. LeGrier to become immediately paralyzed.  True?

22       A    Correct.

23       Q    There's a photograph of that wound.

24   Correct?

52

1     A    Yes.

2     Q    And in terms of identifying the severity of

3  that injury, how would you do that?

4     A    Could you be more specific?

5     Q    In terms of the partial transection.

6     A    I guess could you be more specific?

7     Q    Sure.  Would the x-rays in this case help

8  you determine the tunnel of damage created by that

9  projectile?  Given that the projectile was recovered

10  from the area of L1-L2.

11     A    I don't believe so, actually, no.

12     Q    Okay.  But you haven't looked at the

13  x-rays, so you don't know whether they'd be helpful

14  to you in determining the significance of that spinal

15  column injury.  True?

16     A    I don't use x-rays to determine

17  significance of soft tissue injury in general.  So I

18  would not use that in my -- my assessment of a spinal

19  cord injury.

20        Strictly speaking, those x-rays in a

21  gunshot wound case are often for location of

22  projectiles and determining fractures.  Not for soft

23  tissue assessment.

24     Q    But to the extent the projectile was

53

1    retained within the body, the x-ray would be helpful

2    to you to determine the location, anatomically, of

3    that projectile.  True?

4         A    Yes.

5         Q    You have not attempted to reconstruct the

6    scene and determine where all the individual

7    participants were.  Correct?

8         A    Physically?  No.

9         Q    And you don't have an opinion, within a

10   reasonable degree of medical certainty, as to the

11   exact position of Quintonio LeGrier at the time of

12   the shooting.  True?

13        A    That's correct.

14        Q    And same for Bettie Jones.  True?

15        A    That's correct.

16        Q    I think at this point, I'd yield the

17   questioning over to Mr. Rogers.

18                     EXAMINATION

19   BY MR. ROGERS:

20        Q    Hi, Doctor.

21             Hi, Dr. McElligott.  Did I pronounce that

22   correctly?

23        A    Yes.

24        Q    I think I just have a few questions.

54

1    Hopefully we won't keep you long.

2              In your opinion, to a reasonable degree of

3    certainty within the field of forensic pathology, it

4    was as a result of being struck by Officer Rialmo's

5    bullet that Bettie Jones experienced extensive

6    internal injuries.  Correct?

7         A    Yes.

8         Q    Those injuries included a perforation of

9    her heart?  True?

10        A    Yes.

11        Q    A perforation of her aorta?  True?

12        A    Yes.

13        Q    Perforation of her esophagus causing

14   associated bilateral hemothoraces?  Correct?

15        A    Yes.

16        Q    Perforation of the hemocardium?  True?

17        A    Hemocardium is blood within the

18   pericardial sac.  So perforation of the pericardium

19   would be more accurate.  But, yes.

20        Q    And fractures of her sternum.  True?

21        A    Correct.

22        Q    Those injuries, in your opinion, to a

23   reasonable degree of medical certainty, would cause

24   her conscious pain and suffering.  True?

55

1    A    It's possible to a degree.  Yes.

2    Q    She was conscious, based upon your review

3  of the materials, at the time that she was shot.

4  Correct?

5    A    I don't know that I specifically saw that.

6  I'm trying to remember.

7    MS. BOUDREAUX:  He said at the time she was

8  shot.

9    THE WITNESS:  Oh, at the time she was shot, yes,

10  she was conscious.  Sorry.

11  BY MR. ROGERS:

12    Q    And as a result of sustaining the gunshot

13  wound from the bullet fired by Officer Rialmo, she

14  would have experienced conscious pain and suffering.

15  True?

16    A    To what degree, I can't speculate, but --

17    Q    I didn't ask you to what degree.

18    My question is this.  In your opinion, to a

19  reasonable degree of medical certainty within the

20  field of forensic pathology, Bettie Jones, more

21  likely than not, suffered conscious pain and

22  emotional suffering as a result of the bullet that

23  was fired by Officer Robert Rialmo.  True?

24    A    Yes.

56

1     Q    That bullet caused the injuries, the

2  extensive internal injuries, that we just described.

3  Correct?

4     A    Yes.

5     Q    And as a result of those injuries, she

6  sustained conscious pain and suffering.  True?

7     A    Yes.

8     Q    You described blood collecting in her

9  pericardial sac.  Is that correct?

10     A    Yes.

11     Q    And blood collection in the

12  pericardial sac, it causes a tamponade effect and

13  pressure on the heart.  Correct?

14     A    Yes.

15     Q    And what impact does that have on the

16  heart?

17     A    It prevents it from pumping the blood or

18  beating.

19     Q    As blood accumulates and collects in the

20  pericardial sac surrounding the heart, it compresses

21  the heart and affects its ability to beat.  Correct?

22     A    Yes.

23     Q    Would you agree that Bettie Jones likely

24  experienced a change to her respiration rate as her

57

1   condition began to decline as a result of that

2   bleeding?

3       A    Yes.

4       Q    And what would you expect, in your opinion,

5   to have occurred as a result with respect to her

6   bleeding and respiration rate?

7       A    Again, I'm not a clinician.  So I don't

8   know what, necessarily, the immediate responses are.

9   I mean, obviously the eventual -- eventual outcome is

10  a gradual slowing of the respiration rate.  But I

11  don't know if that's the immediate response or not.

12                  (Whereupon, Mr. Thomas arrived at the

13                   deposition.)

14  BY MR. ROGERS:

15      Q    You did not -- you were not provided the

16  sworn deposition testimony of her daughter, Latisha

17  Jones, who described what she observed in the time

18  period following her mother's injury.  True?

19      A    Correct.

20      Q    That, again, would be helpful to you in

21  discerning exactly what impact the gunshot wound, and

22  the injuries caused by that wound, had on Bettie

23  Jones in the minutes following the injury.  True?

24      A    It's possible.  Yes.

58

1    Q    Well, if she described what her mother was

2   saying to her and what she sensed in terms of her

3   respiration rate and her activities, that would be

4   helpful to you in discerning the length of time

5   Bettie Jones sustained conscious pain and suffering.

6   True?

7    A    Yes.

8    Q    If you had been provided the discovery

9   deposition of Latisha Jones -- strike that.

10        In your opinion, to a reasonable degree of

11   certainty within the field of forensic pathology,

12   Bettie Jones' manner of death was homicide as a

13   result of a gunshot wound -- gunshot fired by

14   Officer Rialmo.  True?

15    A    Yes.  The manner is homicide.

16    Q    In your opinion, to a reasonable degree of

17   certainty within the field of forensic pathology,

18   Quintonio LeGrier died -- or the manner in which he

19   died was homicide as a result of a gunshot fired by

20   officer -- or multiple gunshots fired by

21   Officer Rialmo.  True?

22    A    The manner would be homicide.  Yes.

23    Q    In your -- strike that.

24        In your report, you do not identify any

59

1    conditions or ailments that you can say, to a

2    reasonable degree of medical certainty, would

3    reduce -- that would have reduced Bettie Jones' life

4    expectancy.   True?

5         A    That's correct.

6         Q    Bettie Jones sustained a front-to-back

7    anterior, meaning front-facing, gunshot wound as a

8    result of a bullet fired by Officer Robert Rialmo.

9    True?

10        A    Correct.

11        Q    So she would have been facing the weapon

12   that he was pointing in her direction.   True?

13        A    The -- yes.   The front of her body was --

14   and the barrel of the gun were positioned relative to

15   one another.   Yes.   (Indicating.)

16        Q    Would it be fair to characterize the

17   location of Bettie Jones' wound as more or less in

18   the center of her chest?

19        A    It was very close to the center.   Yes.

20        Q    Would it be fair to say that Bettie Jones'

21   gunshot wound was front to back with a downward

22   trajectory and was consistent with her attempting to

23   get out of the way?

24        MS. BOUDREAUX:   I'm going to object.   Calls for

60

1   speculation.

2   BY MR. ROGERS:

3        Q    You may answer.

4        A    Could you be more specific with "attempting

5   to get out of the way"?

6        Q    Would it be fair to say that a gunshot

7   wound that was front to back with a downward

8   trajectory of the type that Bettie Jones sustained

9   would be consistent with her attempting to get down,

10  meaning leaning forward to get down out of the way?

11       A    I think that it could be consistent with a

12  forward-leaning position.  Yes.

13       Q    This tunnel of damage -- strike that.

14            You believe the 9-millimeter bullet that

15  traveled through Bettie Jones' chest and lodged in

16  her back, perforating various organs ranging from the

17  heart to the aorta to her esophagus and then

18  traveling through her sternum, would have caused a

19  tunnel of damage?

20       A    Yes.  All bullets do.

21       Q    And that's your opinion to a reasonable

22  degree of certainty within the field of forensic

23  pathology?

24       A    Yes.

61

1    Q    Do you know Dr. Lary Simms?

2    A    No.

3    Q    You subjectively characterized, in your

4  report, Bettie Jones to have sustained an

5  insignificant amount of pain and suffering.  Is that

6  correct?

7    MS. BOUDREAUX:  I'll object to the form of the

8  question.

9    THE WITNESS:  No, I didn't state that.

10 BY MR. ROGERS:

11   Q    You subjectively characterized Bettie Jones

12 to have experienced -- strike that.

13        In your opinion, Bettie Jones did sustain

14 conscious pain and suffering.  True?

15   A    Correct.

16   Q    But you subjectively characterize that pain

17 and suffering as being insignificant.  True?

18   MS. BOUDREAUX:  Same objection.  To that word.

19   THE WITNESS:  No, I did not use that word.

20 BY MR. ROGERS:

21   Q    You are of the opinion that Bettie Jones

22 did not sustain significant conscious pain and

23 suffering.  Is that correct?

24   A    That's what I stated.  Yes.

62

1      Q    And that's your subjective characterization

2  of the degree of her pain and suffering.  True?

3      MS. BOUDREAUX:  I'll object to that

4  characterization.

5           How did you form that opinion?

6  BY MR. ROGERS:

7      Q    You may answer.

8           My question is a direct question.

9           You subjectively characterized Bettie Jones

10 as unlikely experiencing a significant amount of

11 conscious pain and suffering.  True?

12     A    True.

13     Q    And, again, that was without having

14 reviewed the testimony of her daughter and eyewitness

15 who sat there with her and described, in detail,

16 exactly what she saw, observed, and heard her mother

17 say.  True?

18     A    Correct.  I did not read that deposition.

19     Q    You have never gone to the scene.  Correct?

20     A    Correct.

21     Q    Based upon the location and nature of

22 Bettie Jones' wound, there was no reason that she

23 would not have experienced conscious pain and

24 suffering as a result of the nature of her wound.

63

1   True?

2       A    Yes.  I think that's true.

3       Q    That's all I have.

4       MR. KENNEDY:  I've got a few more.

5                    FURTHER EXAMINATION

6   BY MR. KENNEDY:

7       Q    Doctor, there was no evidence at autopsy

8   that Quintonio LeGrier had any natural disease

9   processes that would have shortened his lifespan.

10  Correct?

11      A    Correct.

12      Q    Quintonio LeGrier most likely experienced

13  pain at the site of his injuries after being shot.

14  Correct?

15      A    It's possible.

16      Q    Quintonio LeGrier most likely experienced a

17  feeling of impending doom and shortness of breath as

18  he exsanguinated.  Correct?

19      MS. BOUDREAUX:  Calls for speculation.

20      THE WITNESS:  I don't think I can speak to that.

21  BY MR. KENNEDY:

22      Q    I wanted to clarify.  In terms of your

23  background, the only time you've testified before a

24  trial as a paid consultant was that one case where

64

1   Ms. Boudreaux hired you.  Correct?

2        A    No, actually, I'm sorry, there was another

3   case in McHenry County where I was a paid consultant

4   in a drug-induced homicide case.  It's on the list.

5        Q    And who was paying for your time on that

6   case?

7        A    It was a private law firm in Crystal Lake.

8   I can find it for you if you need the -- let's see.

9   People -- it's the last case listed.  People versus

10  John Linder.

11       Q    So other than that case, the only time

12  you've offered trial testimony as a paid consultant

13  was when Ms. Boudreaux retained you.  Correct?

14       A    I believe so.  Yes.

15       Q    And that was also a City of Chicago case.

16  Correct?

17       A    That's correct.

18       Q    Except for the McHenry County case and the

19  prior case when Ms. Boudreaux retained you, all the

20  other times you've testified at trial you've been

21  testifying as the autopsy pathologist.  Correct?

22       A    I believe so.

23            I think there were a couple of times I

24  testified in place of another Cook County

65

1    pathologist.  But I was employed by the County.

2        Q    In other words, you were the stand-in

3    pathologist testifying to your colleague's autopsy

4    findings.  Correct?

5        A    Yes.  Correct.

6        Q    And that was because the autopsy -- that

7    was because your colleague was -- had moved out of

8    state or was sick or was out on maternity leave,

9    something like that.  Correct?

10       A    Correct.  Yes.  That's correct.

11       Q    Did anyone assist you in the preparation of

12   your report?

13       A    No.

14       Q    Did anyone assist you in summarizing or

15   reviewing the materials in this case?

16       A    No.

17       Q    Did you submit a draft of your report to

18   Ms. Boudreaux?

19       A    I don't have a draft.  I just use a

20   Word document and change as I -- as I go.

21       Q    Did you call and discuss your report with

22   Ms. Boudreaux prior to submitting it to her?

23       A    The report specifically?  No.

24       Q    Okay.

66

1    MR. ROGERS:  I have a couple others.

2                    FURTHER EXAMINATION

3  BY MR. ROGERS:

4    Q    What percentage -- strike that.

5         In terms of your consulting work, what

6  percentage of that has occurred where you were

7  retained by a lawyer for the plaintiff, or injured

8  party?

9    A    Let's see.  That's a good question.

10        I'm not sure that I have that.

11   Q    Has all of your work been for the defense?

12   A    I -- I believe so.  I'll go back and

13 double-check.  And if I find otherwise, I will let

14 you know, but ...

15   Q    Okay.  So as you sit here today, your

16 recollection is that 100 percent of your consulting

17 work as a forensic pathologist has been in support of

18 the defense.  True?

19   A    Let me take another look.  I'm trying to

20 remember.  Sorry.

21        Oh, well, yeah -- well, in Ross versus City

22 of Chicago, I know -- that was my autopsy.  But I was

23 retained by the City and plaintiff's attorneys with

24 that case.

67

1      Q    I'm sorry, you were retained by who?

2      A    The City and plaintiff's attorneys for Ross

3   versus --

4      MR. KENNEDY:  She was subpoenaed to testify.

5      THE WITNESS:  Yeah, I was subpoenaed.  I'm

6   sorry, yeah, I wasn't paid for that.  But that's the

7   only thing I can think of that would be close to what

8   you're asking.

9      MR. ROGERS:  Oh.

10     THE WITNESS:  So, no, I only have done some -- a

11  few defense consults.

12  BY MR. ROGERS:

13     Q    To your recollection, you've never been --

14  you've never worked as a consultant on behalf of an

15  injured plaintiff or the family of a deceased.

16  Correct?

17     A    I don't believe so.  No.

18     Q    Based on your recollection, and your review

19  of your experience as a consultant, you've worked

20  100 percent of the time for the defense.  Correct?

21     A    I believe so.  Yes.

22     Q    If I asked you to identify a percentage of

23  time you spend in a given year doing consulting work,

24  as compared to your other responsibilities in your

68

 1    field of expertise, what percentage would you

 2    attribute to the consulting work?

 3         A    A very small percentage.  I would say

 4    10 percent or less.

 5         Q    And how long have you been doing consulting

 6    work?

 7         A    On and off for about three or four years.

 8    It's just kind of catch-as-catch-can, honestly.

 9         Q    How did you get started doing consulting

10    work?

11         A    Just reference by a colleague.

12         Q    Who was that?

13         A    Jim Filkins.

14         Q    Another forensic pathologist?

15         A    Correct.

16         Q    And who did he first refer you to?

17         A    I think it was the other case that I worked

18    with Barrett on.  I think it was Othman versus City

19    of Chicago.

20         Q    So you started your work as a legal

21    litigator -- strike that.

22              You started your work as a litigation

23    consultant with Barrett Boudreaux.  Is that correct?

24         A    I believe so.

69

1      Q    All right.  And in 2017, how much money

2  would you estimate you earned doing consulting work

3  in this field?

4      A    I don't think I did any last year, to be

5  honest.

6      Q    How about 2016?  In 2016, how much money

7  would you say you earned doing consulting work on

8  legal matters?

9      A    Let's see.  Again, I don't think there was

10  a consult in '16.  It's -- I'm trying to

11  differentiate in my head because I get paid for

12  Cook County cases, because I no longer work there.

13  But I don't think I was paid in '16 as a retained

14  expert.

15          I think in '15 was the year I did Othman.

16  So I was paid that year.

17      Q    So in '15, what would you say you were paid

18  doing consulting work?

19      A    I don't -- I don't honestly know.

20      Q    I saw your rate is $600 per hour?  Is that

21  correct?

22      A    Yes.

23      Q    Was that your rate in 2015?

24      A    I believe so, yes.

70

1    Q    Do you know how many hours you've spent on

2    this case up to today's date?

3    A    A little more than -- I submitted the list.

4    I don't remember.  It was 30-something?

5    Q    And you have some hours you obviously have

6    not billed for, because at least you've completed

7    your deposition.  Correct?

8    A    Correct.

9    Q    You and Barrett Boudreaux are friends.

10   Correct?

11   A    Facebook friends.  Which is totally

12   different.

13        No, I just -- she has a son my son's age,

14   more or less, so we've just -- that's it.

15   Q    I've got a son, too.

16   A    That's it.  I mean, I've never met with her

17   outside of professional cases, case work.  Never gone

18   out or anything like that.

19        We have colleagues who know each other.

20   Like I know people she works with.  She knows people

21   I work with.  And that's how we know each other.  But

22   we don't have a friendship outside of that.

23   Q    Who else do you know that she works with?

24   A    Dr. Segovia at the Medical Examiner's

71

1   Office.  I believe she knows her through Dr. Filkins.

2   And probably other cases she's done.  So just --

3   that's it.

4        Q    Thank you.

5        MR. KENNEDY:  I've got a couple follow-up.

6        THE WITNESS:  Sure.

7                    FURTHER EXAMINATION

8   BY MR. KENNEDY:

9        Q    Dr. Filkins is both an MD and a JD.

10  Correct?

11       A    Yes.

12       Q    And he was actually employed by the City of

13  Chicago's Law Department for a time.  Correct?

14       A    Yes.

15       Q    You described your consulting work earlier

16  as catch-as-catch-can?  Did I get that right?

17       A    Yes.

18       Q    Would it be your hope to continue to

19  maintain your relationship with Ms. Boudreaux and

20  work on future cases with her?

21       MS. BOUDREAUX:  Object to relevance.

22       THE WITNESS:  I accept work as I am able to take

23  it.  I have three kids and a full-time job.

24            So when I say catch-as-catch-can, I just

72

1   mean if I have the time to set aside for it, I will

2   do it.  It has nothing to do with who's offering it

3   to me or ...

4   BY MR. KENNEDY:

5       Q    Have you ever declined to consult on a

6   case?

7       A    Yes.  I did just get a case offered me last

8   month that I declined.

9       Q    And that was the first time you've declined

10  work that someone's offered to you.  Correct?

11      A    Yes.

12      Q    And what was it about that matter that you

13  weren't interested in or declined it?  Why?

14      A    I don't have the time.

15      Q    Was that a plaintiff's case or a defense

16  case, do you recall?

17      A    It would be the defense again.

18      Q    I think I'm done.

19      MS. BOUDREAUX:  All right.  I have a few.

20                      EXAMINATION

21  BY MS. BOUDREAUX:

22      Q    Does the fact that you worked with me on

23  another case, did that affect any of your opinions in

24  this case?

73

1      A    No.

2      Q    Did you base your opinions on the review of

3  the record and the evidence, the autopsy findings?

4      A    Yes.

5      Q    And everything you've testified today you

6  testified to to a reasonable degree of certainty in

7  the field of forensic pathology.  Correct?

8      A    Yes.

9      Q    Okay.  And you reviewed the reports of Lary

10  Simms?  Correct?

11     A    Yes.

12     Q    And you reviewed the report of Judy

13  Melinek.  Right?

14     A    Yes.

15     Q    And Judy Melinek attached the x-rays of

16  Quintonio LeGrier's lumbar injury.  Correct?

17     A    Yes.

18     Q    And based on your review of this x-ray, are

19  you able to tell the extent to which the partial

20  transection of his spinal cord would have immediately

21  paralyzed him?

22     A    No.

23     Q    Okay.  Can anyone tell that based on this

24  x-ray?  (Indicating.)

74

1      A     I doubt it.

2      Q     Okay.  That's all the questions I have.

3            We'll reserve.

4      THE VIDEO TECHNICIAN:  This is the end of the

5  deposition.

6            The time is 11:32 a.m.  The length of this

7  recording is 1 hour 17 minutes 37 seconds.  And we

8  are off the record.

9                  (End of video record.)

10     THE REPORTER:  Counsel, are you ordering this

11  transcript?

12     MR. KENNEDY:  Yes.  I'll take it.

13     MS. BOUDREAUX:  I'll take a copy.

14     THE REPORTER:  Mr. Thomas, would you like a copy

15  of the transcript?

16     MR. THOMAS:  Yes.  We'll take a copy, please.

17  Thank you.

18            (Proceedings adjourned at 11:32 a.m.)

19                  *    *    *    *    *

20

21

22

23

24

75

```
 1       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT, LAW DIVISION
 2
ANTONIO LEGRIER, etc.,              )
 3              Plaintiff,          )
                -vs-                )  No. 15 L 12964
 4  CITY OF CHICAGO,                )
                Defendant.          )
 5  ------------------------------  )
LATARSHA JONES, etc., et al.,       )  Cons. with
 6              Plaintiffs,         )
                -vs-                )  No. 16 L 00012
 7  CITY OF CHICAGO,                )
                Defendant.          )
 8

 9       This is to certify that I have read my

10  deposition taken on Friday, April 20, 2018, in the

11  foregoing cause, and that the foregoing transcript

12  accurately states the questions asked and the answers

13  given by me, with the changes or corrections, if any,

14  made on the Errata Sheet attached hereto.

15

16

     _____
17          HILARY McELLIGOTT, MD

18  No errata sheets submitted _____ (Please initial)

19  Number of errata sheets submitted _____ pages

20  SUBSCRIBED AND SWORN TO
    before me this _____ day
21  of _____, A.D. _____.

22

    _____
23          Notary Public

24  ///
```

76

1       I, LAURA L. KOOY, a Certified Shorthand
Reporter within and for the State of Illinois, do
2 hereby certify:

3       That previous to the commencement of the
examination of the witness, the witness was duly
4 sworn to testify the whole truth concerning the
matters herein;

5

6       That the foregoing deposition was reported
stenographically by me, was thereafter reduced to a
printed transcript by me, and constitutes a true
7 record of the testimony given and the proceedings
had;

8

9       That the said deposition was taken before
me at the time and place specified;

10       That the reading and signing by the witness
of the deposition transcript was agreed upon as
11 stated herein;

12       That I am not a relative or employee or
attorney or counsel, nor a relative or employee of
13 such attorney or counsel for any of the parties
hereto, nor interested directly or indirectly in the
14 outcome of this action.

15       IN WITNESS WHEREOF, I do hereunto set my
hand this 22nd day of April, 2018.

16

17

18                   _____
                  LAURA L. KOOY, CSR, RDR, CRR
19                   Notary Public
                  CSR No. 084-002467
20

21

22

23

24