# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| RUBA OTHMAN, as special administrator of the Estate of RAMIZ OTHMAN, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 11-cv-5777 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| CITY OF CHICAGO, a Municipal Corporation; AARON CARRANZA, in his individual and official capacity; and THOMAS BEHAN, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Plaintiff's motion to vacate jury verdict, for sanctions, and for a new trial [269] is denied. This case remains closed.

**I.      Background**

By way of background, this case proceeded to a jury trial on Plaintiffs' excessive force claim in August 2015. The jury returned a verdict for Defendant. In February 2016, the Court issued a nineteen-page memorandum opinion and order [259] denying Plaintiffs' motions for new trial and for post-trial discovery. Plaintiff filed a notice of appeal [261], but her appeal was dismissed for failure to comply with Circuit Rule 3(c) [see 268]. Almost three years later, invoking Federal Rule of Civil Procedure 60(d)(3), Plaintiff filed the instant motion seeking sanctions and a new trial based on an alleged fraud on the Court.

**II.     Discussion**

The Seventh Circuit has repeatedly observed that "Rule 60 relief is limited to 'extraordinary' situations where a judgment is the inadvertent product of 'special circumstances

and not merely [the] erroneous application[ ] of law.'" *Kennedy v. Schneider Electric*, 893 F.3d 414, 419 (7th Cir. 2018) (quoting *Russell v. Delco Remy Div. of Gen. Motors. Corp.*, 51 F.3d 746, 749 (7th Cir. 1995)). The court of appeals has further stressed that although "Rule 60 gives district courts the power and discretion to modify their judgments when truly new facts come to light or when the judge recognizes an error and believes it should be corrected, * * * judges exercising that flexibility must be careful not to undermine too lightly the finality of their judgments." *Id.*; see also *Mendez v. Republic Bank*, 725 F.3d 651, 657, 660 (7th Cir. 2013) (noting need to "balance the availability of post-judgment relief with finality interests," which is not a problem "in the rare case where a district judge recognizes a clear legal or factual error" soon after entering judgment).

"Rule 60 recognizes two types of fraud in the adversarial process that, if demonstrated within the proper timeframe, may merit relief from a final judgment." *Kennedy*, 893 F.3d at 419. First, Rule 60(b)(3) permits a party to seek relief on the basis of "fraud[,] * * * misrepresentation, or misconduct by an opposing party" that prevented the party seeking relief "from 'fully and fairly presenting'" his meritorious case at trial. See *Wickens v. Shell Oil Co.*, 620 F.3d 747, 759 (7th Cir. 2010) (finding that discovery violation did not amount to fraud); *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995). Parties asserting this type of "fraud on the opposing party" must move for relief within one year of "the entry of the judgment or order or the date of the proceeding." *Kennedy*, 893 F.3d at 419 (quoting Fed. R. Civ. P. 60(c)(1)).

The second type is "fraud on the court," see Fed. R. Civ. P. 60(d)(3), which the Seventh Circuit has described as fraud "directed to the judicial machinery itself" and involving "circumstances where the impartial functions of the court have been directly corrupted." *In re Whitney-Forbes, Inc.*, 770 F.2d 692, 698 (7th Cir. 1985) (citation omitted). Motions seeking relief for fraud on the court can be brought at any time after judgment because the "conduct * * * might

be thought to corrupt the judicial process itself[.]" *Oxxford Clothes v. Expeditors Intern. of Washington, Inc.*, 127 F.3d 574, 578 (7th Cir. 1997). Because a "motion to set aside a judgment on the ground of fraud on the court has no deadline," the definition of "fraud" contemplated by the rule must be "defined narrowly lest it become an open sesame to collateral attacks." *Kennedy*, 893 F.3d at 419-20 (quoting *In re Golf 255, Inc.*, 652 F.3d 806, 809 (7th Cir. 2011) (internal quotations and citation omitted)). Given the "high bar for what constitutes fraud on the court under Rule 60(d)(3)," the Seventh Circuit has stated that "the alleged fraud must go beyond mere discrepancies in the record evidence available at the time judgment was entered" and instead "must have been the kind of fraud that ordinarily could not be discovered, despite diligent inquiry, within one year or even many years." *Kennedy*, 893 F.3d at 419-20; see also *Citizens for Appropriate Rural Rds. v. Foxx*, 815 F.3d 1068, 1080 (7th Cir. 2016) ("Fraud on the court occurs only in the most extraordinary and egregious circumstances and relates to conduct that might be thought to corrupt the judicial process itself, such as where a party bribes a judge or inserts bogus documents into the record.").[1]

The purported fraud here relates to the testimony of Dr. Hilary McElligott. Both in her deposition and at trial in this case, Dr. McElligott testified that she performed the autopsy of Plaintiff's decedent, Ramiz Othman, who was shot and killed by Defendant Carranza after breaking into Carranza's home. According to her testimony, Dr. McElligott was employed by the

---

[1] Finally, in regard to the applicable legal standards, Defendants suggest that Plaintiff must come forward with "clear and convincing" evidence of the alleged fraud, citing a few older cases that seem to support that proposition. See *In re Whitney-Forbes, Inc.*, 770 F.2d 692, 698 (7th Cir. 1985); *DiVito v. Fidelity & Deposit Co.*, 361 F.2d 936, 939 (7th Cir. 1966). However, the more recent case of *Ty, Inc. v. Softbelly's Inc.*, 353 F.3d 528, 537 (7th Cir. 2003), points out that "most federal fraud laws do not require proof by clear and convincing evidence, but only by a preponderance of the evidence" and questions "why Rule 60(b)(3) should be thought to set a higher standard." In view of the Court's conclusion that Plaintiff's motion is properly viewed as alleging a fraud on a party cognizable under Rule 60(b)(3), rather than a fraud on the court under Rule 60(d)(3)—and therefore is time-barred—the Court need not resolve the standard that would apply if the Court were to reach the merits.

Cook County Medical Examiner's Office as an attending forensic pathologist at the time of the autopsy in August 2010, but had moved on to a different position as chief forensic pathologist in DuPage County by the time of her deposition in June 2013 and her trial testimony in August 2015.

In Rule 26 disclosures transmitted on September 17, 2013 and June 11, 2014, and again in the final pre-trial order filed on July 8, 2015, Defendants identified Dr. McElligott as an expert witness who may be called upon to testify at trial regarding the autopsy that she conducted on August 21, 2010. Both in her deposition and at trial, the bulk of Dr. McElligott's testimony was given with reference to an autopsy report which she prepared in 2010. As of the date of her deposition in 2013, Dr. McElligott testified that she had no independent recollection of the Othman autopsy "beyond remembering that I did it." She did not generate a separate report (beyond the original autopsy report) for her testimony in this case, as would have been required had she been a retained expert within the meaning of Federal Rule of Civil Procedure 26(a)(2)(B).

The parties appear to disagree about the scope and import of Dr. McElligott's trial testimony. In her original motion, Plaintiff, without citation to any transcripts, recalls the following about Dr. McElligott's testimony:

> a) Using a foam dummy and trajectory rods [she] gave an opinion as to the location of the Decedent and policeman, Aaron Carranza, when he shot Ramiz Othman 14 times.
>
> b) That using the trajectory rods, Dr. McElligott corroborated the testimony of Aaron Carranza that Ramiz Othman threatened Carranza with a tire iron poised above his head by stating her opinion that the gunshot trajectories were consistent with Ramiz Othman's arm being raised above his head.
>
> c) That Dr. McElligott substantiated the testimony of Carranza that the six (6) shots to the back of Ramiz Othman occurrred as he was falling and twisting.
>
> d) That Dr. McElligott substantiated the testimony of other Chicago policemen that blood spatters on the walls indicated Ramiz Othman was between the basement door and bedroom door and ignored blood smear on the other side of the door jam and floor.

In response, and with citations to the transcript, Defendants contend that Dr. McElligott did not provide any testimony or opinions related to the positioning of Mr. Othman and Defendant Carranza during the incident. Nor, Defendants assert, did she testify about the blood spatters located at the scene of the shooting. In reply, Plaintiff maintains (still without any citations to the transcript) that Defendants "used the testimony of the pathologist very convincingly that Carranza did not advance on Othman, but Othman was attacking Carranza with a tire iron."

In support of her request for extraordinary relief under Rule 60, Plaintiff relies on deposition testimony given in 2018 in another action to contend that Dr. McElligott was acting in the forbidden dual capacity of autopsy pathologist and paid consultant when she testified in this case. Because the latter role was not disclosed by Defendants either before, during, or after the trial, Plaintiff contends that she was a victim of fraud on the court and should receive damages or sanctions as well as a new trial. Defendants respond that the 2018 deposition testimony on which Plaintiff relies reflects a simple misstatement by Dr. McElligott and that Plaintiff has not demonstrated an entitlement to any form of relief.

The triggering event for Plaintiff's motion was an April 20, 2018 deposition of Dr. McElligott in *LaGrier v. City of Chicago*, 15 L 12964, and *Jones v. City of Chicago*, 16 L 00012, state court cases arising out of events unrelated to the underlying dispute in this case. There, as here, Dr. McElligott had been identified as a potential witness by the City of Chicago. Dr. McElligott testified that she had been hired by the City's counsel to give testimony in the *Jones* case "as a paid consultant." When asked about prior work for the City, Dr. McElligott identified this (*Othman*) case and testified that (1) she was a "paid consultant" and (2) she did not perform the autopsy of Mr. Othman.

5

The first question presented by the motion is whether, as Defendants insist, Dr. McElligott simply misspoke during her deposition in *LaGrier* and *Jones*. There is a good deal of common sense to that position. We know that she misspoke as to statement (2).[2] The more than 100 pages of deposition transcript and the dozens more pages of trial transcript attached to Plaintiff's motion make abundantly clear that Dr. McElligott *did* perform the autopsy of Ramiz Othman. She testified in detail from her records and confirmed that her initials were placed at the bottom of each page of the autopsy report. Since we know that statement (2) is not correct, it certainly is plausible that Dr. McElligott misspoke as to statement (1) as well and simply did not recall the role that she undertook in this (*Othman*) litigation.

Further analysis of Dr. McElligott's deposition and trial testimony in the instant case—both what she said and what she relied upon in saying it—lends support to the notion that she was *not* testifying as a retained expert. Like an emergency room treating physician, an autopsy pathologist has no way of anticipating the work she will be doing each day. The daily routine of an autopsy pathologist involves working on whatever body fate places before her and then documenting the grim task of explaining what she can about the cause(s) of death. It is no wonder that, when testifying years after the fact, persons in these professions usually have no memory of any of the details of their work. They must testify from their notes—which is exactly what unfolded in this case. Had Dr. McElligott been a retained expert, she would have been required to prepare a report and the questioning at the deposition and the trial likely would have changed a great deal. In addition, she could have offered opinions outside the scope of the contemporaneous autopsy notes.

---

[2] In fact, if statement (2) were accurate, Plaintiff would have no basis for bringing this motion.

The suggestion that Dr. McElligott's 2018 testimony was simply a mistake makes even more sense when one considers the wider context. Dr. McElligott testified in 2013 and 2018 that she was the Chief Forensic Pathologist for DuPage County. At her 2013 deposition, she was asked whether she had ever been disciplined or received complaints and answered in the negative to both questions. She readily agreed that it would be improper to act as a paid consultant in a case in which she had been the autopsy pathologist. Yet Plaintiff submits that she did exactly that in *Othman*, thereby putting at risk her reputation and perhaps her license and her job, to give testimony in one case. That seems unlikely. The far more likely explanation for this scenario is Defendants'—that Dr. McElligott misspoke.

But even if she did not misspeak—and she did serve as *both* the autopsy pathologist *and* a retained expert in this case—that would be a fraud on the plaintiff (potentially remediable under FRCP 60(b)(3)), not a fraud on the court (within the meaning of FRCP 60(d)(3)). As Judge Kennelly has written, "[m]ere non-disclosure by a party or a party's attorney in a civil case does not amount to a fraud upon the court." *Apotex Corp. v. Merck & Co., Inc.*, 2006 WL 1155954, at *6 (N.D. Ill. Apr. 25, 2006); see also 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2870 (1995); *Wilson v. Johns-Mansville Sales Corp.,* 873 F.2d 869, 872 (5th Cir.1989) (declining to grant plaintiffs' 60(b) motion when defendants successfully used a "state of the art" defense in a products liability trial and plaintiffs later learned of studies, of which the defendants were aware, that undercut the defendants' theory).

Plaintiff's counsel knew at the time of the 2013 deposition that Dr. McElligott had left Cook County, where she was working at the time that she performed the autopsy, to become the chief pathologist in DuPage County. That disclosure provided a natural opening for inquiry into the financial arrangements for her testimony, but no questions were asked on that subject.

7

Tellingly, at the outset of the 2018 deposition in the *LaGrier/Jones* litigation, counsel made inquiries into the compensation that Dr. McElligott received for her trial and deposition testimony in prior cases. Those same kinds of questions could have been asked, either at deposition or on cross-examination at trial, in this case. It is commonplace to compensate doctors, whether they are treating physicians or autopsy pathologists, for their time in working on litigation (see *Hoover v. United States*, 2002 WL 1949734, at *6 (N.D. Ill. Aug. 22, 2002)), and thus equally commonplace to ask about that subject. To the extent that Plaintiff complains that Dr. McElligott's actual trial testimony went beyond the matters identified in her autopsy report and ventured into the kinds of opinions that would have been proper only if they had been disclosed under the rules applying to retained experts, the proper course would have been a contemporaneous objection seeking to cabin her trial testimony. Again, counsel asked nothing about Dr. McElligott's compensation and raised no objections on the scope of her trial testimony.[3] Simply put, in the unlikely event that Dr. McElligott was engaged in what she acknowledged would be an unethical practice—namely, serving both as autopsy pathologist and paid consultant—nothing could have stopped Plaintiff from uncovering that conduct in real time, rather than three years after the fact.

With the foregoing discussion in mind, returning to the applicable standards for differentiating fraud on a *party* from fraud on the *court* confirms that the conduct alleged here falls into the former category, not the latter. The kind of "diligent inquiry" referenced by the Seventh Circuit (see *Kennedy*, 893 F.3d at 419-20) would have gone a long way toward revealing the taint, if any, associated with the dual role that Plaintiff suspects Dr. McElligott played in this case.

---

[3] It is worth noting that Plaintiff complained during trial and in his post-trial motions about Defendants' withdrawal of a different expert—Alexander Jason. The Court addressed Plaintiff's complaint about the withdrawal of Mr. Jason in its opinion denying Plaintiff's motions for post-trial relief [see 259, reported at 2016 WL 612809, at *9].

8

Moreover, given that Dr. McElligott's actual testimony tracked, at least in the main, a typical presentation by an autopsy pathologist and did not stray far beyond the opinions disclosed in her report—at least not far enough to draw even a perfunctory contemporaneous objection—any prejudice to Plaintiff from any ethical violation that Dr. McElligott may have committed would have been minimal.  Put more colloquially, even if we are to credit her 2018 deposition testimony in which Dr. McElligott claimed that she was not a duck, she certainly walked and talked like a duck at the 2015 trial.  In substance, this is a far cry from bribing a judge or inserting bogus documents into the record or any of the other scenarios in the "fraud on the court" cases.

Of course, classifying the allegations in Plaintiff's motion as falling within the "fraud on the opposing party" side of Rule 60 means that "the motion must be made within a year after the judgment sought to be vacated becomes final." *Ty, Inc.*, 353 F.3d at 536; see also *Kennedy*, 893 F.3d at 419-20.  Under that rule, Plaintiff's motion was untimely and must be denied.

Date:  February 12, 2019

_____
Robert M. Dow, Jr.
United States District Judge